## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. _____

FLORIDA GUN SHOWS, INC.,
A Florida corporation, f/k/a SHOOT
STRAIGHT GUN SHOWS, INC.

      Plaintiff,

v.

CITY OF FORT LAUDERDALE ,
A Florida Municipality,

      Defendant.

_____/

### VERIFIED COMPLAINT

Plaintiff, FLORIDA GUN SHOW, INC., a Florida Corporation, complains against THE

CITY OF FT. LAUDERDALE, a Florida municipality, and alleges as follows.

### PARTIES

1.      Florida Gun Show, Inc. ("FL Gun Show") is a Florida Corporation having Florida

as both its domicile and principal place of business.  Prior to a change of name in 2015, FL Gun

Show was named SHOOT STRAIGHT GUN SHOWS, INC.

2.      The City of Ft. Lauderdale (the "City") is a Florida municipality, and is a

"person" within the meaning of 42 U.S.C. § 1983.

### JURISDICTION & VENUE

3.      This Court has subject matter jurisdiction of the federal question claims pursuant

to 28 U.S.C. §§ 1331 and 1343(a)(3).  Plaintiff seeks to redress a deprivation of rights guaranteed

by the First and Fourteenth Amendments to the United States Constitution, Pursuant to 42 U.S.C. § 1983.

4.     This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367(a) over claims that are so related to the claims over which this Court has original jurisdiction that they form part of the same controversy.

5.     The Court has the authority to render declaratory judgments and to issue permanent injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 and Rule 65. Fed.R.Civ.P.

6.     The Court may award attorneys' fees pursuant to 42 U.S.C. § 1988.

7.     Venue is proper in the Southern District of Florida because the City is located in the Southern District of Florida and all of the acts complained of herein have occurred in the Southern District of Florida.

## FACTUAL BACKGROUND

8.     FL Gun Show is in the business of organizing and promoting gun shows throughout the State of Florida, including at the War Memorial Auditorium (the "WMA").

9.     The City owns and operates the WMA.  The WMA is an exhibition hall which first opened its doors in 1950 and was intended to serve as a living memorial to the veterans and fallen soldiers of World War II.

10.     The City Describes the WMA as a "multi-purpose facility" located in Holiday Park within the City of Ft. Lauderdale.  The City licenses the use of the WMA to exhibitors, performers and artists, including for "gate" shows like the gun show.  In its early days, the WMA has hosted performances by a wide variety of artists.  Currently, the WMA hosts boxing matches, mixed martial arts competitions, body building competitions, magic shows, LGBT community

events along with a wide variety of other events and exhibitions including, of course, guns shows. Indeed, the WMA has hosted multiple gun shows per year for many years.

11.     To accommodate its exhibitors that promote shows at the WMA year after year on a repeat basis, the City uses a reservation hold system. Under that system, the City holds or reserves future dates, in some cases years into the future, for its exhibitors. Those "hold" dates are reserved for the benefit of the exhibitor and essentially operate as a right of first refusal. For example, if a new potential exhibitor wants to use the WMA on a date already reserved for another exhibitor, the reserved date can only be given away if the exhibitor for whom it was reserved agrees and meets other conditions.

12.     The reservation hold system employed by the City at the WMA benefits all parties involved. It provides repeat exhibitors with the security of knowing that they have dates reserved into the future so that they can plan and invest accordingly. The hold system also provides the City with the security of knowing that its facility is booked with experienced and knowledgeable repeat exhibitors that have demonstrated their ability to run safe and profitable shows at the WMA.

13.     Upon information and belief, the "hold" system is also widely employed by other fairgrounds and exhibition halls throughout Florida as a standard industry practice. The hold dates are binding and allow exhibitors the ability to plan for future events.

14.     In or about 2014, FL Gun Show purchased Suncoast Gun Shows ("Suncoast"). Prior to its acquisition by FL Gun Show, Suncoast had been in the business of promoting multiple gun shows per year at the WMA and had been doing so for many, many years. Upon purchasing Suncoast, FL Gun Show acquired the right to promote future gun shows at the WMA on the dates already reserved by the City for Suncoast.

15.     In or about 2014, the City and FL Gun Show entered into a so-called license agreement at the WMA for the 2015 calendar year.  That agreement set forth the fees, costs and conditions for FL Gun Show's use of the WMA in 2015 for the promotion of six "Gun and knife" shows on dates specifically identified in that agreement.  Aside from the gun show dates identified in FL Gun Show's 2015 license agreement with the City, FL Gun Show also had future "hold" dates for additional gun shows years into the future not only through its purchase of Suncoast, but on its own behalf as a repeat promotor of gate shows at the WMA in accordance with WMA's own practice and procedures.

16.     Each year, the parties executed substantially similar license agreements covering gun show dates at the WMA for 2016, 2017, and 2018, adding a seventh show for years 2017 and 2018.  The City has never advised FL Gun Show of any default under any of its license agreements, or even of a potential default thereunder.  Thus, it is the parties' custom and practice that, prior to the expiration of whichever current license agreement the parties were operating under, the parties would execute another license agreement covering the previously agreed-upon dates for the promotion of the gun show for the following calendar year.  As each subsequent license agreement is executed, the executory "hold" dates for that calendar year move from "hold" status to contracted status and became a part of the parties' new license agreement. Upon information and belief, the City ulitizes this "hold/reserved dates to contract dates" procedure for all promoters of gate shows at the WMA, not just for Plaintiff.

17.     Similarly, on or about July 6, 2017, the City and FL Gun Show entered into yet another license agreement covering the previously agreed upon hold dates for gun shows for the 2018 calendar year (the License Agreement).  A true and correct copy of the License Agreement is attached hereto as Exhibit "1."  Like the three previous license agreements that came before it,

the License Agreement sets forth the fees, costs and conditions for FL Gun Show's use of the WMA to promote "Gun and knife" shows for the year 2018.

18.     As was the practice and custom of the parties, in addition to the 2018 dates listed in the License Agreement, FL Gun Show selected and reserved future dates for gun shows at the WMA though the year 2025.

19.     Given that: (i) the City's WMA license agreements cover a single calendar year; (ii) that it has been the parties' course of conduct to execute new license agreement year after year and (iii) that FL Gun Show has valid specific "hold dates" for gun shows though at least 2025, FL Gun Show has an expectation and right to receive a license agreement covering the 2019 gun show dates it already has on hold for 2019 and so forth for every subsequent year for which dates are already reserved.

20.     Pursuant to the License Agreement and the ones that preceded it, to date, FL Gun Show has promoted approximately twenty-four gun shows at the WMA over 4 years.  For each of those shows, FL Gun Show has met all of its financial commitments under the various license agreements and has also complied with every other condition imposed by those agreements concerning insurance, police presence, parking, licensing, permitting, gun safety and many other topics.  All of the shows promoted by FL Gun Show at the WMA have been successes; all have run smoothly, safely and without incident; and literally thousands of visitors attend each of FL Gun Show's gun shows.

21.     Despite FL Gun Show's history of promoting successful and safe gun shows at the WMA for many years, as a result of the tragic shooting deaths of a number of Broward County students at the hands of a criminal, the political climate in Broward County in 2018 has become very hostile towards gun shows and gun rights in general.

5

22.     During a City commission meeting held on March 20, 2018, City Commissioners turned their attention to the issue of gun shows at the WMA.  At that meeting, the City's recently elected Mayor, Mr. Dean Trantalis and several Commissioners expressed their view that it was time for the City to stop allowing gun shows at the WMA.  Excerpts from that meeting include:

> "[I]t seems to me that we have -- we have a situation that the community has – continues to speak out against having the gun show at War Memorial. I'm hopeful that this commission will put on the record its opinion that we should not continue this gun show after the license agreement expires."
>
> <u>Mayor Trantalis: Transcription of Commission Meeting</u>, pg. 3, lines 19-25, attached hereto as Exhibit "2."

> "I do believe it was the opinion of the past commission to continue the gun show and to continue the license as-is, but now that we have a new commission, I think we have a different philosophy.
>
> <u>Mayor Trantalis: Transcription of Commission Meeting</u>, pg. 8, line 24, through pg. 9, line 2.

> "We can have an intelligent discussion, which we all know what our hearts want and what we're trying to do to protect our community and our kids based on the recent activity in Coral Springs.  I think we all are very, very concerned about a gun show being in our park. . . ."
>
> <u>Commissioner McKinzie: Transcription of Commission Meeting</u>, pg. 10, lines 7-13.

> "I guess the sense of the commission is how – what opportunity do we have to terminate this license agreement so that we no longer have to host this at War Memorial Auditorium.
>
> <u>Mayor Trantalis: Transcription of Commission Meeting</u>, pg. 11, lines 18-21.

23.     The City's legal staff was asked to look into whether there were any grounds for the early termination of the License Agreement and a special meeting was scheduled to take

place the following month to debate the subject. That follow up meeting took place on April 3, 2018.

24.     Although no official decision was announced at the April 3, 2018 public meeting, the comments made by the Mayor and the commissioners indicated that while the City might not go so far as to terminate the License Agreement early out of concern that doing so might lead to litigation, the City was unlikely to offer FL Gun Show a new License Agreement for 2019 and would not be honoring FL Gun Show's future hold dates. By letter dated August 31, 2018, without additional explanation or the identification of any cause, the City informed FL Gun Show that it would not be entering into a 2019 license agreement with it and that FL Gun Show would not be allowed to promote Gun Shows at the WMA beyond those identified in the License Agreement. A true and correct copy of the August 31, 2018 letter is attached hereto as Exhibit "3." The City has refused to renew FL Gun Show's License Agreement even though the City has committed itself to hold/reserve dates for FL Gun Show through at least 2025.

25.     As a political subdivision of the State of Florida, organized and operating under the laws of the State of Florida, the City and its officials were, and are, acting under color of state law in refusing to rent or license its publicly-owned facility to a lawful and legitimate business.

26.     The City's refusal to rent its publicly-owned facility to a lawful and legitimate business is a violation of FL Gun Show's constitutional right to engage in commercial speech and is violative of FL Gun Show's right to equal protection under the law.

## FIRST CAUSE OF ACTION

### FOR VIOLATION OF THE RIGHT TO FREE SPEECH UNDER THE UNITED STATES CONSTITUTION

27.     Plaintiff incorporates by reference paragraphs 1 though 26 of this Complaint as though fully set forth herein in their entirety.

28.     Through its promoted shows at the WMA, FL Gun Show seeks to propose a commercial transaction that is not false, deceptive or misleading.

29.     FL Gun Show is attempting to engage is protected commercial speech.

30.     The City's refusal to rent its publicly-owned facility to a legal and legitimate business does not advance any substantial or compelling state interest and subjects FL Gun Show to the deprivation of free speech rights secured by the First Amendment to the United States Constitution.

31.     The deprivation of FL Gun Show's free speech rights is subject to action pursuant to 42 U.S.C. § 1983.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

a.  A declaration that Defendant's actions in refusing to rent its publicly-owned facility to Plaintiff violate the First Amendment to the United States Constitution by infringing upon Plaintiff's right to engage in commercial speech;

b.  An order compelling the Defendant to allow Plaintiff to promote its gun shows at the Defendant's facility on the specific dates promised to it;

c.  Issue the requested injunctive relief without a condition of bond or other security being required of the Plaintiff;

d.  That this Court award Plaintiff its costs and expenses, including its attorneys' fees, pursuant to 42 U.S.C. § 1988; and

e.  Such other relief as the Court deems just and equitable.

## SECOND CAUSE OF ACTION

### FOR VIOLATION OF THE RIGHT TO EQUAL PROTECTION UNDER THE LAW UNDER THE UNITED STATES CONSTITUTION

32.     Plaintiff incorporates by reference paragraphs 1 through 26 of this Complaint as if fully set forth herein in their entirety.

33.     The Fourteenth Amendment to the United States Constitution provides that no state shall deny any person the equal protection of the laws.

34.     Although FL Gun Show runs a legal and legitimate business and although the WMA is suitable for the purpose of hosting gun shows, the City refuses to allow FL Gun Show to use the WMA for the promotion of its gun shows.

35.     The City's refusal to permit FL Gun Show to use the WMA for its promoted guns shows does not further any substantial or compelling state interest.

36.     The City's refusal to do business with FL Gun Show while continuing to license its publicly-owned facility to other similarly situated legal and legitimate businesses is a violation of FL Gun Show's right to equal protection under the law.

37.     The violation of Plaintiff's right to equal protection under the law is subject to action pursuant to 42 U.S.C § 1983.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.  A declaration that Defendant's actions in refusing to rent its publicly-owned facility to Plaintiff violate the Fourteenth Amendment to the United States Constitution by infringing upon Plaintiff's right to equal protection under the law;

b.  An order compelling the Defendant to allow Plaintiff to promote its gun shows at the Defendant's facility on the specific dates promised to it;

    c.  Issue the requested injunctive relief without a condition of bond or other security being required of the Plaintiff;

    d.  That this Court award Plaintiff its costs and expenses, including its attorneys' fees, pursuant to 42 U.S.C. § 1988; and

    e.  Such other relief as the Court deems just and equitable.

### THIRD CAUSE OF ACTION

### VIOLATION OF FLORIDA STATUTE § 790.33 (STATE LAW CLAIM)[1]

38.    Plaintiff incorporates by reference paragraphs 1 through 26 of this Complaint as if fully set forth herein in their entirety.

39.    By adopting and enforcing an anti-gun show policy at its publicly-owned facility, the City is regulating the purchase, sale, transfer and ownership of firearms and ammunition in violation of Florida Statute § 790.33.

40.    FL Gun Show has been injured by the City's actions in violation of Florida Statute § 790.33, which provides specifically in the language of the statute for injunctive relief.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

    a.  A declaration that Defendant's actions in refusing to rent its publicly-owned facility to Plaintiff violates Florida Statute §790.33;

    b.  An order compelling the Defendant to allow Plaintiff to promote its gun shows at the Defendant's facility on the specific dates promised to it pursuant to Florida Statute § 790.33(3)(b);

    c.  That this Court award Plaintiff its actual damages pursuant to Fl. Stat. §790.33(3)(f);

---

[1] Plaintiff reserves the right to amend the instant complaint to add any individual(s) who may be subject to penalties under Fl. Stat §790.33(3)(a).

d.  That this Court award Plaintiff its costs and expenses, including its attorneys' fees, pursuant to Fl. Stat. §790.33(3)(f); and

e.  That the Court grant such other relief as the Court deems just and equitable under the circumstances

Dated: September  27 , 2018.

Respectfully Submitted,

**WOODBURY, SANTIAGO & CORREOSO, P.A.**
Counsel for Plaintiff
9100 S. Dadeland Blvd., Suite 1702
Miami, FL 33156
Telephone (305) 670-9580

By:   /s/ Michael P. Woodbury
         Michael P. Woodbury (FBN 983690)
         Robert P. Santiago (FBN 62650)

## VERIFICATION

I SWEAR under penalty of perjury that the factual allegations contained in this Verified Complaint are true and correct to the best of my personal knowledge, except where otherwise indicated.

Khaled Akawwi
President, Florida Gun Shows, Inc.

11

**EXHIBIT "1"**

CITY OF FORT LAUDERDALE
# WAR MEMORIAL AUDITORIUM
## EST. 1950

### LICENSE AGREEMENT, WAR MEMORIAL AUDITORIUM

**THIS AGREEMENT**, made and entered into this **6th** day of **JULY 2017** is by and between the City of Fort Lauderdale, a Florida municipality, ("Licensor" or "City"), and

Legal Name: **FLORIDA GUN SHOWS, INC** ("Licensee")
Address: **1349 S ORANGE BLOSSOM TRAIL**
**APOPKA, FL 32703**
Representative: **MR. KHALED AKKAWI**
Phone: 407-410-6870          Fax:
Email: ka@reagan.com

### WITNESSETH:

WHEREAS, the City owns and operates the War Memorial Auditorium ("WMA"), located at 800 N.E. 8th Street, Fort Lauderdale, Florida, 33304; and

WHEREAS, the Licensee would like to present a **GUN AND KNIFE SHOW** at the War Memorial Auditorium, and the Licensee having duly determined the suitability of WMA for said event,

In consideration of the mutual promises set forth herein and other good and valuable consideration, the Licensor and the Licensee hereby agree as follows:

1.   The Licensor does hereby grant to the Licensee a license to use the War Memorial Auditorium for the purpose of presenting a **GUN AND KNIFE SHOW**, and for no other purpose whatsoever. Performances on **SEE EXHIBIT 2**. Building access commencing at **SEE EXHIBIT 2** and terminating at **SEE EXHIBIT 2**.

2.   The Licensee shall pay the Licensor a license fee of **THIRTY THOUSAND TWO HUNDRED FORTY DOLLARS ($30,240.00)** minimum or **N/A** N/A %) of the gross receipts, excluding sales tax, if any, in excess of the stated minimum license fee, whichever is greater, plus expenses. When there is a matinee performance scheduled on the same day as an evening performance, the minimum license fee shall be increased by **N/A** (**$N/A** ). Rehearsals on the day of performance or otherwise shall be an expense of the Licensee at a cost of **N/A** (**$N/A**) per performance, plus personnel required. Rehearsals are considered Stage Only use. The presence of more than seventy-five spectators at a rehearsal will generate a charge for an additional performance.

3.   The Licensor agrees to furnish water and electrical service for normal use, but any use of either in excess of what is reasonable in the City's sole opinion, is over and above what is included in the license fee and must be paid for by the Licensee within fourteen days following Licensor's dispatch of an invoice therefor to the Licensee.  In addition, Licensee shall pay

Licensor for any help provided by the auditorium management and for the use of special equipment in accordance with the labor and equipment charges set forth in Exhibit 1, which is attached hereto and incorporated herein, within fourteen days following Licensor's dispatch of an invoice therefor to the Licensee.

4.   The Licensee reserves the right exclusively to operate all food and drink concessions within and without the walls of the Auditorium. The Licensee shall ensure that no exhibitor, sublicensee or person shall offer for sale, give away, or otherwise dispose, or distribute, any drink, ice cream, candy, or food of any type, amount, quantity, or nature, without prior approval by Licensor.

5.   Licensee agrees to have one (1) fifteen (15) minute intermission, or two (2) ten (10) minute intermissions for each stage performance, if any.

6.   **THIS AGREEMENT IS MADE AND ENTERED INTO UPON THE FOLLOWING EXPRESS COVENANTS AND CONDITIONS:**

a)   Licensee shall pay City of Fort Lauderdale business tax, which is presently $157.50 per year.

b)   Licensee shall ensure that all gun vendors are duly licensed firearm dealers.

c)   Licensee shall ensure that vendors perform background checks in connection with all gun sales pursuant to applicable Florida and federal law.

d)   Parking for Gun Show attendees shall be limited to designated War Memorial Auditorium parking areas.

e)   Licensee shall arrange and pay for police detail, which shall consist of a minimum of 5 reserve officers within WMA for general security, two officers to patrol WMA parking areas, two officers within WMA for policing of private weapons sales, and one supervisor.

f)   The number of required officers on detail shall be reassessed as conditions merit on a show to show basis, and is subject to change, in the Licensor's sole discretion.

g)   Licensee shall ensure that all weapons entering WMA, or on the premises of Holiday Park are encased in a corresponding soft or hard case or holster.

h)   Licensee shall ensure that there is a designated check-in and inspection table in the WMA lobby, where Licensee shall check, inspect, secure, and disable with wire ties, all firearms, and shall check, inspect, and secure any other weapons, that attendees wish to bring into the Gun Show. Licensee shall not allow into the Gun Show any firearms or other weapons that are not so secured and disabled.

i)   Any attendees not unloading firearms or who have live ammunition shall have said ammunition confiscated and they may not be allowed into the gun show at the discretion of the City of Fort Lauderdale police officer on detail.

j)   Weapons shall be inspected by a Florida Gun Shows staff member, who shall be supervised by a City of Fort Lauderdale police officer on detail. Only upon completion of this inspection, and with the firearm(s) secured and disabled, and any other weapon duly secured, shall Licensee allow an attendee to enter the Gun Show with a firearm or other weapon.

k)   Licensee shall not allow any Gun Show attendee to carry more than two firearms into the WMA.

2



b.  If a Gun Show attendee wishes to have work or repairs performed on a weapon and the vendor needs to remove the securing wire tie, Licensee shall ensure that the vendor reapplies the wire tie and secures the weapon made immediately upon completion of the repair.

7.  In order to definitely reserve the specific dates hereinabove set forth, Licensee must execute this contract in duplicate and **return both** executed copies to Licensor for official signature of the Licensor, together with the required license fee within **FOURTEEN DAYS (14)** days after date of this contract. Deposit Required: **$1785.00.** All license fees are Non-Refundable, except in the case of a Force Majeure or Licensor's uncured material default.

8.  The Licensee shall obtain and pay for any license required for all music and other performance rights as imposed by ASCAP, BMI, and any and all other similar licensors during Licensee's use of the Licensor's facilities. The Licensee shall protect and defend at Licensee's expense, counsel being subject to the City's approval, and indemnify and hold harmless the Licensor from and against any and all losses, penalties, fines, damages, settlements, judgments, claims, costs, charges, royalties, expenses, or liabilities, including any award of attorney fees and any award of costs, in connection with or arising directly or indirectly out of any infringement or allegation of infringement of any music rights, performance rights, copyright, or any other intellectual property right in connection with the Licensee's event.

9.  All Ticket Sales/Admission Fees on the day of the Performance(s) shall be sold by the Licensor *via* WMA's box office staff. All priced tickets and admission fees shall include a Facility Fee of $3.00 each, which shall be paid to the Licensor. Licensee shall advertise all ticket prices and admission fees inclusive of WMA Facility Fees. WMA shall be entitled to twenty-four (24) complimentary tickets per event or performance. WMA reserves the right, at management's sole discretion, to withhold seats from public sale in order to satisfy any patron and/or equipment relocation needs. The Licensee shall furnish the Licensor in writing full and complete information concerning the types and numbers of all tickets sold, (advance sales and day of event sales) and the established ticket prices of such tickets, and shall furnish the Licensor with copies of all manifests and other reports furnished by Licensee to the Internal Revenue Service, all as promptly as may be possible. Complimentary, zero price, tickets shall be limited to 10% of the entire ticket manifest and are subject to approval by the WMA manager. The Licensor retains the right to make determination of ticket refunds for cause, in keeping with the Licensor's policy of retaining public faith. This shall include, but not be limited to, seats blocked by equipment when exchange for comparable location is not possible, failure of projection equipment, failure to act, to show, or to perform within reasonable time of schedule provided by Licensee.

Licensee shall exclusively utilize WMA's computerized ticketing system for the sale of all tickets whether *via* outlets, phone centers, internet, or mobile devices. The distribution or sale of tickets and admission fees through any other channels, including discount websites, social media outlets, or Licensee's offices is prohibited without the express, written consent of the Licensor.

10.   Any sum owed the Licensor by the Licensee for the use of WMA, and the cost of any accommodations, services or materials shall be deducted from the box office receipts of Licensee.

11.   As a condition precedent to the effectiveness of this Agreement and prior to each event, Licensee shall provide to the Licensor a certificate of commercial general liability insurance with an AM Best's A- rated or better insurance company authorized to issue insurance policies in the State of Florida, subject to approval by the Licensor's risk manager, in an amount not less than $1,000,000 combined single limit for bodily injury and property damage, including coverage for premises/operations, products/completed operations, contractual liability, independent contractors, and liability arising out of the indemnification provision. As a condition precedent to the effectiveness of this Agreement and prior to each event, Licensee shall provide to the Licensor a certificate of business auto liability insurance with an AM Best's A- rated or better insurance company authorized to issue insurance policies in the State of Florida, subject to approval by the Licensor's risk manager, in an amount not less than $1,000,000 per occurrence combined single limit for bodily injury and property damage, including coverage for owned autos and other vehicles, hired autos and other vehicles, heavy equipment, non-owned autos and other vehicles. The commercial general liability policy shall name the City of Fort Lauderdale, a Florida municipality, as an additional insured. In addition, as a condition precedent to the effectiveness of this Agreement and prior to each event, Licensee shall provide to the Licensor a certificate of workers' compensation insurance, including employer's liability, with an AM Best's A- rated or better insurance company authorized to issue insurance policies in the State of Florida, subject to approval by the Licensor's risk manager, with limits not less than $100,000 per accident, $500,000 disease (policy limit), and $100,000 disease (each employee) in compliance with all state and federal laws. Licensee shall provide to the Licensor at least thirty (30) days written notice by registered or certified mail, return receipt requested, addressed to the WMA manager, prior to cancellation or modification of any required insurance. City reserves the right to adjust the insurance coverage requirements, depending upon the risk of loss and exposure to liability.

**All required insurance policies shall cover all show set-up, move-in and move-out days.**

12.   Not later than seven (7) days before the first day of the event the Licensee shall furnish the Licensor a list of the performers, groups and or actors that will be using WMA in any staged, theatrical, or concert performance.

13.   The Licensee shall reimburse the Licensor all reasonable additional expenses incurred by the Licensor for and on behalf of the Licensee's event. Services and personnel required and expenses incurred by WMA shall be limited to those which are, in the Licensor's opinion essential, beneficial and normally required of a licensee during its occupancy of the Auditorium. All charges will be itemized on the Licensor's final statement when presented to the Licensee for payment. Licensor shall provide final statement and conduct the final settlement with Licensee the first business day following the closing performance day of the event. All services are subject to six percent Florida sales tax, unless Lessee is tax exempt pursuant to Florida law.

14.    Any and all riders attached to this Agreement become part of this Agreement, with the same force and effect as though written into the body thereof.

15.    The Licensee shall comply with all laws of the United States, the laws of the State of Florida, including but not limited to the Florida Building Code and the Florida Fire Prevention Code, all ordinances of the City of Fort Lauderdale, and all rules and requirements of the Police and Fire Departments and other municipal authorities of the City of Fort Lauderdale, and shall not do, nor allow to be done, anything on said premises during the term of this License Agreement in violation of any such laws, ordinances, rules or requirements, and if the attention of said Licensee is called to any such violation on the part of said Licensee, or of any person employed by or admitted to the said premises by said Licensee, such Licensee shall immediately desist from and correct the violation. Licensee shall obtain and pay for all necessary permits and licenses. Licensee shall abide by all rules and regulations promulgated by the Licensor in regard to the use of the War Memorial Auditorium and/or Holiday Park.

16.    Licensor shall retain the right to cause the interruption of any performance, or event, and likewise to cause the termination of such performance, or event, when in the judgment of WMA Management, such action is necessary in the interests of public safety.  Should it become necessary, in the judgment of WMA Management, to evacuate the premises because of an emergency, or for other reasons of public safety, the Licensee shall retain use of the premises for sufficient time to complete presentation of its activity without additional charge providing such time does not interfere with another licensee's use of the building.  If it is not possible to complete presentation of the activity, the license fee shall be forfeited, prorated, or adjusted at the discretion of the Licensor based upon the situation; and the Licensee hereby waives any claim for damages or compensation from the Licensor. Licensor reserves the right to make such announcements as are deemed necessary at any time in the interest of public safety.  Licensee agrees that it will cooperate with the delivery of such announcements for public safety, including but not limited to announcements to require patrons to return to their seats or to enter or leave the premises.

17.    Should the Licensee cancel the event covered under this Agreement, and in the event that the WMA cannot be licensed otherwise on that date, the deposit amount shall be forfeited by the Licensee and the amount applied to the full basic license fee shall be payable by the Licensee to the Licensor as liquidated damages, not as penalty, and Licensee agrees also to pay any other expenses incurred by the Licensor in connection with the event covered by the Agreement.

18.    The Licensor reserves the right to cancel this Agreement for good cause. In the event the Licensor exercises its right, it shall refund to the Licensee any basic license fee paid to the Licensor.

19.    Should the Licensee default in the performance of any of the terms or conditions of this Agreement, the Licensor at its option may terminate the same and the Licensee shall be liable for the full amount of the basic license fee provided for herein, less the license fees received from others for use of the premises at the time or times specified in this Agreement.



Any deposit made by the Licensee to the Licensor, however, shall, upon default, be retained by the Licensor for liquidated damages as an offset to expenses incurred, and not as a penalty.

20.    The Licensee shall not injure, nor mar, nor in any manner deface the WMA, and shall not cause or permit to be driven nails, hooks, tacks or screws into any part of said premises, and will not make, nor allow to be made any alterations of any kind therein.

21.    In the event the premises or any portion of the WMA or its equipment, during the term of this License Agreement is damaged by the act, default, or negligence of the Licensee or any of the Licensee's agents, employees, subcontractors, exhibitors, attendees or guests, Licensee shall promptly pay to Licensor such sum as shall be necessary to restore said premises to their condition at the time of the commencement of this License Agreement.

22.    Licensee authorizes Licensor to arrange for and have on duty at all necessary times sufficient police force, as determined by City, to maintain order and protect persons and property, with the express understanding that Licensee, in final settlement, shall pay for such services of such police force. Upon request from Licensor, Licensee shall immediately reassign or remove from the Event any of its employees or personnel, including any supervisory personnel, who, in the sole judgment of Licensor, engage in improper conduct, or are not otherwise, in the reasonable judgment of Licensor, suitable or acceptable to perform their duties or any tasks assigned to them. Licensee and its employees, personnel and agents shall comply with and conform to all rules, regulations and directives issued by Licensor or its designees from time to time.

23.    The Licensee will permit no chair, movable seat, or other obstruction, to be or remain in the passageways, and will keep said passageways clear at all times. The Licensee shall not permit the entrance doors to be locked during any period when the public is allowed into the Auditorium.

24.    The Licensee shall not post or exhibit, nor allow to be posted or exhibited, signs, advertisements, showbills, lithographs, posters or cards of any description, inside or in front, or on any part of said building, except upon the regular billboards provided and/or authorized by the Licensor therefor, and will use, post or exhibit only such signs, advertisements, showbills, lithographs, posters or cards upon said billboards as relate to the performance or exhibit that is the subject of this License Agreement. Further, Licensee shall not post any signs in violation of any of the City's ordinances. Posting of signs in violation of any of the City's ordinances may result in immediate termination of this Agreement and of the event by City, Licensee shall be given reasonable opportunity to remedy any such default or breach.

25.    The Licensee shall not admit to the WMA a larger number of persons than the legal capacity thereof will accommodate or can safely or freely move about in said licensed areas, and the decision of the WMA management in this respect shall be final. This provision applies to any type event, show or performance.

26.    The Licensor shall have the sole right to collect and have custody of articles left in the building by persons attending any performance, exhibition or entertainment given or held at

6

the WMA, and the Licensee, or any persons in Licensee's employ, shall not collect nor interfere with the collection or custody of such articles. Notwithstanding the foregoing, Licensor shall notify Licensee of any equipment or articles inadvertently left at the facility by Licensee and provide Licensee with a reasonable opportunity to remove same prior to removal or disposal by Licensor.

27.     The Licensor reserves the right to remove from the building and/or the appurtenant grounds all Licensee's effects remaining in the building and/or the appurtenant grounds after termination time specified at the expense of Licensee and to charge Licensee $200.00 per day for the time after the termination date specified herein for any property remaining in the building and/or on the appurtenant grounds, provided however, in the event of a Force Majeure, Licensee shall have a reasonable period of time at no expense.

28.     The authorized representatives of the Licensor may enter the WMA building and all of the appurtenant grounds and premises, including any outside structure, tent, or fixture, at any time.

29.     Absent the express, written approval of the City of Fort Lauderdale Fire Marshal, Licensee shall not erect or operate any engine, motor or machinery on the premises, shall not use oil, burning fluids, camphene, kerosene, naphtha, solvents or gasoline for mechanical or other purpose, and shall not use any agent other than electricity for illuminating the premises. .

Licensee shall drain the fuel tanks of any and all equipment, automobiles, boats or other types of display wherein a fuel tank is attached, including auxiliary fuel tanks and outboard motors prior to bringing any of such equipment into the WMA. No type of fuel shall be placed in any fuel tanks until any and all equipment, automobiles, boats or other types of display have been placed outside the building.

Licensee authorizes Licensor to arrange for and have on duty at all necessary times sufficient Fire-Rescue Department personnel, as determined by City, to protect persons and property, with the express understanding that Licensee, in final settlement, shall pay for such services of such Fire Department personnel.

30.     In any legal action to collect any fees, charges or expenses due from Licensee hereunder, the Licensee agrees to pay to Licensor Licensor's reasonable attorney fees and costs.

31.     The Licensee shall not assign, transfer, or sublicense this License Agreement or any part thereof, nor suffer or permit any use of said premises other than as herein specified, nor sublicense the premises or any part thereof, without the prior written consent of the Licensor.

32.     No horses or other animals shall be brought into said building, or grounds, without the express consent of Licensor, and then under such regulations as may be made by the Licensor.



33.    The Licensee agrees that at no time will the ticket sales exceed the seating capacity and/or the number of individuals that can safely move about in said licensed areas.  The decision of the Licensor in this respect shall be final.

34.    All decorative material must be flame-proof before the same will be allowed in the building.

35.    After unpacking all boxes, cartons, etc., Licensee shall place all loose packing material, paper, etc., in boxes or other containers, and Licensee shall move such boxes and containers to a safe place for storage, as the Licensor directs.

36.    In the event the said facility, or any part thereof, is destroyed by fire or any other cause, or if any other casualty or unforeseen occurrence shall render the fulfillment of this License Agreement by the Licensor impossible ("Force Majeure"), then and thereupon this License Agreement shall terminate, and the Licensee shall pay the pro rata portion of the license fee for use of said premises to the time of such termination, plus any other documented out of pocket expenses incurred by Licensor which are due Licensor under Section 13 above, and any amounts which are due to Licensor in accordance with Sections 2 and 6 above (after taking into account any refunds which may be due).

37.    The Licensor shall not be responsible for any damage or injury that may happen to the Licensee, or to the Licensee's agents, servants, employees, actors, vendors, or property from any cause whatsoever, prior, during or subsequent to the period covered by this License Agreement, and the Licensee hereby releases the Licensor from and agrees to indemnify the Licensor against claims for such loss, damage or injury.

The Licensee shall protect and defend at the Licensee's expense, counsel being subject to the Licensor's approval, and indemnify and hold harmless the Licensor and the Licensor's officers, employees, volunteers, and agents from and against losses, penalties, fines, damages, settlements, judgments, claims, costs, charges, expenses, or liabilities, including any award of attorney fees and any award of costs, in connection with or arising directly or indirectly out of the Licensee's use of the War Memorial Auditorium and appurtenant grounds, or in connection with or arising directly or indirectly out of any act or omission of the Licensee or of any officer, employee, agent, invitee, exhibitor, subcontractor, or sublicensee of the Licensee.

38.    The Licensee shall ensure that sufficient fire, emergency medical services, and police personnel, and parking attendants are on duty the entire number of days the event is open to the public.    The police and parking attendants are engaged and scheduled by the Licensor, but the expense thereof is an obligation of the Licensee and paid for by the Licensee.

39.    The Licensee shall ensure that no car or truck remain on the Auditorium grounds (grass) adjacent to the building, other than the time required to unload and load.  All vehicles must be parked in the Auditorium's parking lots.

40.    In the event the Licensee wishes to engage the service of one or more security guard(s), said service shall be arranged by the Licensor but paid for by the Licensee to the



Licensor at final settlement. This security guard shall be for inside and/or outside use. Said security guard shall be on duty from at least 10:00 pm until 8:00 am during the full period of time displays, exhibits, merchandise, etc. are on the grounds. Any additional indoor security guard, if needed, shall be selected by the Licensor. Said indoor security guard shall not be allowed during his/her scheduled shift to leave the building to inspect exhibits which may be on the grounds of the Auditorium. He or she must remain in the building at all times. Every effort to protect the displays, exhibits, merchandise, etc. shall be made by the said security guard. The City shall not be held liable for loss by theft, damage or disappearance of displays, exhibits, merchandise, etc. from the building and/or grounds, except to the extent that such loss, theft or damage is caused by the negligent or wrongful act or omission of any of Licensor's employees while acting within the scope of their employment, and subject to the limitations of Section 768.28, Florida Statutes (2013), as may be amended or revised from time to time.

41.     The Licensee shall require all exhibitors and sublicensees to lay polyethylene, no less than 6 mils thick, on the floor of the Auditorium (booths) prior to the installation or the laying of any building blocks, grass, concrete, fences, or any material requiring cement, mortar, sand, or dirt. The Licensee shall ensure that no nails are driven into any portion of the floors, walls or woodwork of the Auditorium.

42.     The use of open clip sockets, latex, lamp cord wire, duplex or triplex attachment plugs in exhibits is prohibited. Any and all electrical cords shall be of the three wire, grounded type.

43.     All aisle widths must comply with Fire Marshal orders or regulations.

44.     Qualified representatives of the Licensee shall be on duty in the Lobby of the Auditorium one (1) hour prior to the opening of the doors for admittance of the general public. The East inside Auditorium lobby doors, or any other exits, shall not be locked or otherwise fastened during the term of the Licensee's contract, except for security reasons and then only by authorized WMA employees.

45.     This License Agreement shall be governed by the laws of the State of Florida. Venue for any lawsuit by either party against the other party, or otherwise arising out of this Agreement, and for any other legal proceeding, shall be in Broward County, Florida, or in the event of federal jurisdiction, in the Southern District of Florida.

46.     Licensee shall not discriminate in any of its activities related to this License Agreement against any person on the basis of race, color, gender, national origin, religion, age, disability, or marital status.

47.     In the event any paragraph, section, sentence, or clause of this License Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such holding shall not affect the remainder of this License Agreement, which shall remain in full force and effect.

9



48.   This Agreement is subordinate to any emergency use invoked pursuant to Section 252.42, Florida Statutes (2013), as may be amended or revised, or pursuant to any applicable emergency management program or plan.

49.   The Licensee's use of the War Memorial Auditorium is not an interest in real property.

50.   Licensee shall:

a)   Keep and maintain public records that ordinarily and necessarily would be required by the City in order to perform the service.

(b)  Provide the public with access to public records on the same terms and conditions that the City would provide the records and at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes (2013), as may be amended or revised, or as otherwise provided by law.

(c)  Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law.

(d)  Meet all requirements for retaining public records and transfer, at no cost, to the City, all public records in possession of the contractor upon termination of this contract and destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements. All records stored electronically must be provided to the City in a format that is compatible with the information technology systems of the City.



10

IN WITNESS WHEREOF, the Licensor and the Licensee hereby execute this License Agreement as follows:

WAR MEMORIAL AUDITORIUM

Orlando Castellano
Auditorium Manager

CITY OF FORT LAUDERDALE

Carl Williams
Deputy Director for Parks and Recreation

ATTEST:

By: _____
Print Name: _____
Secretary

(Corporate Seal)

LICENSEE

By: _____
Print Name: _____
Title: _____

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this ___ day of _____ 2017, by _____ as _____ for _____ a _____

(SEAL)

_____
Notary Public, State of _____
(Signature of Notary Public)

_____
(Print, Type or Stamp Commissioned Name of Notary Public)

JOSE A RODRIGUEZ-CASTRO
Commission # GG 111113
Expires June 4, 2021
Bonded Thru Budget Notary Services

Personally Known _____ OR Produced Identification
Type of Identification Produced _____

11

**EXHIBIT I**
**WAR MEMORIAL AUDITORIUM SERVICE CHARGES**
**Effective October 1, 2016**

## LABOR CHARGES

Services required by the War Memorial Auditorium shall be limited to those considered essential and as being beneficial to the Licensee during its occupancy of the Auditorium. The Management shall supply these services whether it be manpower or materials. Management shall act as the contractor and bill the Licensee for required time. The nature of the event determines the use of any personnel listed below. An 19% Administration Fee will be charged on all personnel costs. A service tax of 6% will be added to all labor charges, unless Licensee is tax exempt pursuant to Florida Statutes.

## STAGE TECHNICIANS

A minimum of two persons for all events, including rehearsals, set-ups and strikes is required. Rehearsals may be scheduled at the discretion of the Management. Rehearsals are considered to be a "stage only" use of the building. The presence of any audience will generate a charge for an additional performance. All expenses incurred on behalf of the Licensee's rehearsal are an obligation of the Licensee, including manpower and all overtime. Licensor will order security when Licensor considers it necessary for the safety of occupants and building during rehearsals.

|  | RATE |
|---|---|
| Production Coordinator Hourly Rate | $ 30.00 |
| Production Coordinator Hourly Rate, Saturday & Sunday | $ 42.00 |
| Production Coordinator Hourly Rate, Legal Holidays, Christmas Eve and New Year's Eve | $42.00 |
| Production Coordinator Hourly Rate, Midnight to 8:00 a.m. and after eight consecutive hours | $ 42.00 |
| Production Coordinator Hourly Rate, after sixteen consecutive hours | $60.00 |
| Stage Technician Hourly Rate, per person | $ 28.00 |
| Stage Technician Saturday & Sunday Hourly Rate, per person | $ 42.00 |
| Stage Technician Hourly Rate, Legal Holidays, Christmas Eve and New Year's Eve | $42.00 |
| Stage Technician Hourly Rate, per person, Midnight to 8:00 a.m. and after eight consecutive hours | $ 42.00 |
| Stage Technician Hourly Rate, after sixteen consecutive hours | $56.00 |

12

## ELECTRICIANS

The same pay rates as above apply for those persons laying down portable power distribution and the striking of the same system. During trade shows, a minimum of one person will be on duty for all hours when the building is occupied by exhibitors or show attendees. Management will decide if the show requires more than one person.

## EVENT STAFF

| | RATE |
|---|---|
| House Supervisor, per hour | $ 24.50 |
| Box Office Cashier, per hour | $ 17.50 |
| Event Staff, per hour | $ 17.50 |
| Restroom Attendant, per hour | $ 17.50 |
| | |
| Custodial Services, per hour* | $ 21.50 |
| Fire Watch, per hour | $ 85.50 |
| Security officer, per hour, unarmed | $ 21.50 |
| Parking Lot Staff, per hour | $ 15.50 |
| Park Ranger, per hour | $ 30.50 |
| Police, per hour | $ 38.50 |

(*Services shall be assessed to the Licensee for above normal duties or excess cleaning after a performance, if it becomes necessary, because of Licensee's occupancy.)

## TICKETING CHARGES

Ticketmaster Internet and Phone sales 4%
Credit card sales at WMA Box Office 4%
Tickets printed at WMA Box Office $0.30/ticket

## FACILITY FEES/PARKING RATES

A minimum $3.00 Facility Fee will be charged on tickets and/or admission fees to events at WMA. There will be no charge for parking for the events for which a Facility Fee is charged. The parking fee for events for which admission to WMA is free or no admission is charged, will be at a minimum rate of $6.00/vehicle.

City of Fort Lauderdale staff will be required for all ticket selling and/or admission fees collected at WMA.

13



## EQUIPMENT CHARGES

| EQUIPMENT | RATE |
|---|---|
| CD player, Mini Disc, or Multi Disc each per day | $ 45.00 |
| Chairs (portable), per day | $ 1.50 |
| Clean Up Fee (as needed) | $450.00 |
| Dumpster Fee | $550.00 |
| Pallet Jack per day | $ 30.00 |
| Electric 20 AMP per day | $ 50.00 |
| Load In Kit | $ 30.00 |
| Tables, 8' X 30" | $ 9.00 |
| Tables (Hi Tops) | $ 8.00 |
| Round banquet tables | $ 20.00 |
| Water Hookups per day | $ 40.00 |
| Wireless Mic per day | $ 50.00 |
| WIFI per day | $ 75.00 |
| Broadband internet for broadcasting | $ 250.00 |
| Portalets – Regular | $ 50.00 |
| Portalets – ADA | $ 50.00 |
| 8 x 10 Curtain Booths (black only) | $ 50.00 |
| Includes skirted table and two chairs | |
| Pipe and Drape, per linear foot | $ 2.25 |
| Portable Exterior Box Office | $300.00 |
| Outdoor Festival Front Fence Cover | $500.00 |
| Stage Risers | $ 25.00 |
| French Barricades | $ 10.00 |



11

## Marketing Charges For Clients

| | Cost | On average views | Suggestions/Notes |
|---|---|---|---|
| Facebook Boosts | $100 | 8.000+ | Purchase 2 Facebook Boosts |
| Twitter tagged | Free | 100+ | Facebook/Constant   Contact |
| Constant Contact | $100 | 1.000+ | Display one week before event |
| Marquee/Interior | $200 | 1.000+ a day | Display weeks before the event |
| New Times Banners the event | $125 | 60 CTR / 25K impressions | Runs for 7 days before |
| New Times Re-Skin Runs for 1 day | $250 | 24 hour platform | Purchase  2  re-skins |
| New Times E-Blast | $130 | 15k | Runs for 2 weeks-opt in only |
| City Website page | Free | 1000+ | Viewed  on  Events/  Calendar |
| City's Channel 78 | $100 | 1000+ | Viewed by Comcast subscribers |
| WMA Graphic Designer | $150 | | Slide creation charge, per slide |

- CTR=Click Through Rate - National average is 60 Clicks per 100.000 impressions

## Additional Marketing Tools

| | Cost | | Notes |
|---|---|---|---|
| City Inserts - Mailers residents | $400 | | Mailed  to  City  of  Fort  Lauderdale |
| Bill Boards | $5-15k | | per 4 weeks - Outfront Advertising |
| **Radio** | | | |
| Voiceover | $400 | | Cost to make |
| 30 sec ads | $4.700 | | 80 spots |
| Facebook Post | $300 | | |
| Slider ad | $600 | | Lasts for one week on Radio's website |
| **Television** | | | |
| Deco Drive | | | |
| Palm Cards | $125 | 5k | |
| Posters | $300 | 100 | |
| **Press Release** | | | |
| Miami Herald | FREE | | |
| Sun Sentinel | FREE | | |
| East Sider | FREE | | |
| New Times | FREE | | |
| You Tube | | | |



## Suggested Discount Sales

Groupon

15

EXHIBIT 2

**FLORIDA GUN SHOWS 2018**
**CONTRACTED EVENT DATES**
**AND PRICING**

**· FLORIDA GUN SHOWS**
**2018 CONTRACTED DATES**

**JANUARY 2018**

| | | |
|---|---|---|
| Move in at 8:00 AM | January 12, 2018 | |
| Move out by 11:59 PM | January 14, 2018 | |
| | | |
| January 12, 2018 | Friday move in | $1,470.00 |
| January 13-14, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.00 each | $3570.00 |
| | | $5.040.00 |

**MARCH 2018**

| | | |
|---|---|---|
| Move in at 8:00 AM | March 16, 2018 | |
| Move out by 11:59 PM | March 18, 2018 | |
| | | |
| March 16, 2018 | Friday move in | $1,470.00 |
| March 17-18, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.00each | $3,570.00 |
| | | $5.040.00 |

**MAY 2018**

| | | |
|---|---|---|
| Move in at 8:00 AM | May 4, 2018 | |
| Move out by 11:59 PM | May 6, 2018 | |
| | | |
| May 4, 2018 | Friday move in | $1,470.00 |
| May 5-6, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.00each | $3,570.00 |
| | | $5.040.00 |

**AUGUST 2018**

| | | |
|---|---|---|
| Move in at 8:00 AM | August 10, 2018 | |
| Move out by 11:59 PM | August 12, 2018 | |
| | | |
| August 10, 2018 | Friday move in | $1,470.00 |
| August 11-12, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.each | $3,570.00 |
| | | $5.040.00 |

|                          | **SEPTEMBER 2018**             |            |
|--------------------------|--------------------------------|------------|
| Move in at 8:00 AM       | September 28, 2018             |            |
| Move out by 11:59 PM     | September 30, 2018             |            |
|                          |                                |            |
| September 28, 2018       | Friday move in                 | $1,470.00  |
| September 29-30          | Saturday & Sunday              |            |
|                          | Two Show Days @ $1,785.00each  | $3,570.00  |
|                          |                                | $5.040.00  |

|                          | **NOVEMBER 2018**              |            |
|--------------------------|--------------------------------|------------|
| Move in at 8:00 AM       | November 16, 2018             |            |
| Move out by 11:59 PM     | November 18, 2018             |            |
|                          |                                |            |
| November 16, 2018        | Friday move in                 | $1,470.00  |
| November 17-18, 2018     | Saturday & Sunday              |            |
|                          | Two Show Days @ $1,785 each    | $3,570.00  |
|                          |                                | $5.040.00  |

**TOTAL ALL SHOWS**          $30,240.00

Page 2 of 2

EXHIBIT 2
### REVISED FEBRUARY 5, 2018 to add June 30-July 1, 2018 date

**FLORIDA GUN SHOWS 2018**
**CONTRACTED EVENT DATES**
**AND PRICING**

**FLORIDA GUN SHOWS**
**2018 CONTRACTED DATES**

| | **JANUARY 2018** | |
|---|---|---|
| Move in at 8:00 AM | January 12, 2018 | |
| Move out by 11:59 PM | January 14, 2018 | |
| | | |
| January 12, 2018 | Friday move in | $1,470.00 |
| January 13-14, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.00 each | $3570.00 |
| | | $5,040.00 |

| | **MARCH 2018** | |
|---|---|---|
| Move in at 8:00 AM | March 16, 2018 | |
| Move out by 11:59 PM | March 18, 2018 | |
| | | |
| March 16, 2018 | Friday move in | $1,470.00 |
| March 17-18, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.00each | $3,570.00 |
| | | $5,040.00 |

| | **MAY 2018** | |
|---|---|---|
| Move in at 8:00 AM | May 4, 2018 | |
| Move out by 11:59 PM | May 6, 2018 | |
| | | |
| May 4, 2018 | Friday move in | $1,470.00 |
| May 5-6, 2018 | Saturday & Sunday | |
| | Two Show Days @ $1,785.00each | $3,570.00 |
| | | $5,040.00 |

| | ***JUNE 2018*** | |
|---|---|---|
| *Move in at 8:00 AM* | *June 29, 2018* | |
| *Move out by 11:59 PM* | *July 1, 2018* | |
| | | |
| *June 29, 2018* | *Friday move in* | *$1,470.00* |
| *June 30-July 1, 2018* | *Saturday & Sunday* | |
| | *Two Show Days @ $1,785.00each* | *$3,570.00* |
| | | *$5,040.00* |

Page 1 of 3

|  | **AUGUST 2018** |  |
|---|---|---|
| Move in at 8:00 AM | August 10, 2018 |  |
| Move out by 11:59 PM | August 12, 2018 |  |
|  |  |  |
| August 10, 2018 | Friday move in | $1,470.00 |
| August 11-12, 2018 | Saturday & Sunday |  |
|  | Two Show Days @ $1,785 each | $3,570.00 |
|  |  | $5,040.00 |

|  | **SEPTEMBER 2018** |  |
|---|---|---|
| Move in at 8:00 AM | September 28, 2018 |  |
| Move out by 11:59 PM | September 30, 2018 |  |
|  |  |  |
| September 28, 2018 | Friday move in | $1,470.00 |
| September 29-30 | Saturday & Sunday |  |
|  | Two Show Days @ $1,785.00each | $3,570.00 |
|  |  | $5,040.00 |

|  | **NOVEMBER 2018** |  |
|---|---|---|
| Move in at 8:00 AM | November 16, 2018 |  |
| Move out by 11:59 PM | November 18, 2018 |  |
|  |  |  |
| November 16, 2018 | Friday move in | $1,470.00 |
| November 17-18, 2018 | Saturday & Sunday |  |
|  | Two Show Days @ $1,785 each | $3,570.00 |
|  |  | $5,040.00 |

**TOTAL ALL SHOWS**   $30,240.00

***REVISED TOTAL ALL SHOWS***   ***$35,280.00***



WAR MEMORIAL AUDITORIUM

Orlando Castellano
Auditorium Manager

CITY OF FORT LAUDERDALE

Carl Williams
Deputy Director for Parks and Recreation

ATTEST:

By: _____
Print Name: _____
Secretary

(Corporate Seal)

LICENSEE:

By: _____
Print Name: _____
Title: _____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of
_____, 2018, by _____ as
_____, a _____

(SEAL)

JOSE A RODRIGUEZ-CASTRO
Commission # GG 111113
Expires June 4, 2021
Bonded Thru Budget Notary Services

Notary Public, State of _____
(Signature of Notary Public)

_____
(Print, Type, or Stamp Commissioned Name of
Notary Public)

Personally Known _____ OR Produced Identification _____
Type of Identification Produced _____

Page 3 of 3

**EXHIBIT "2"**

Fort Lauderdale Commission Meeting
AUDIO FILE, EXCERPT OF

```
 1

 2

 3

 4              TRANSCRIPTION OF EXCERPT OF AUDIO FILE

 5

 6

 7

 8   In Re:               City of Fort Lauderdale
                          Commission Meeting
 9
     Date:                March 20, 2018
10
     Total Run Time:      00:08:39
11
     Transcribed On:      September 21, 2018
12
     Transcribed By:      Kelly Roma
13                        Court Reporter and
                          Notary Public,
14                        State of Florida at Large

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S:

 2

 3   DEAN J. TRANTALIS, MAYOR

 4   HEATHER MORAITIS, COMMISSIONER

 5   STEVEN GLASSMAN, COMMISSIONER

 6   ROBERT L. MCKINZIE, COMMISSIONER

 7   BEN SORENSEN, COMMISSIONER

 8   ALAIN E. BOILEAU, CITY ATTORNEY

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            This audio file was transcribed by

 2    Kelly Roma, Notary Public, State of Florida at

 3    Large, as follows:

 4            (Excerpt from City of Fort Lauderdale

 5    Commission Meeting of March 20, 2018.)

 6                     PROCEEDINGS

 7            MAYOR TRANTALIS:  Okay.  Is there any further

 8    business?  I have a couple of things I want to talk

 9    about.  We talked this afternoon about the -- about

10    the gun show and about the Wave and the Bahia Mar.

11    With regard --

12            UNIDENTIFIED SPEAKER:  Can you talk into the

13    mic, sir?

14            MAYOR TRANTALIS:  I'm sorry.  This afternoon

15    we talked -- I'm sorry.  This afternoon we talked

16    about the gun show, the Bahia Mar, and the Wave.

17    And I read -- I don't know if any of you had the

18    opportunity to read the license agreement with the

19    gun show.  But it seems to me that we have -- we

20    have a situation that the community has --

21    continues to speak out against having the gun show

22    at War Memorial.

23            I'm hopeful that this commission will put on

24    the record its opinion that we should not continue

25    this gun show after the license agreement expires,
```

```
 1    and I'd like to hear from everybody so that we

 2    can -- we know where we are moving forward on this.

 3         Commissioner Sorensen, do you have anything

 4    to say about this?  Go ahead, Commissioner

 5    Glassman.

 6         COMMISSIONER GLASSMAN:  Yes.  Thank you.  I'm

 7    wondering do we actually have to wait until the

 8    license expires in November, or are we able to take

 9    action prior to the license expiring in November?

10         MAYOR TRANTALIS:  Okay.  Before we answer

11    that question, I guess we're going to have to

12    appoint an interim city attorney right now.  So --

13    we have to appoint an interim city attorney right

14    now.  And do you have any recommendations,

15    Commissioner Sorensen?

16         COMMISSIONER SORENSON:  One name that came to

17    mind was Alain Boileau -- Boileau.

18         MAYOR TRANTALIS:  Boileau.

19         COMMISSIONER SORENSON:  Boileau.

20         MAYOR TRANTALIS:  Is Alain here tonight?  Oh,

21    there you are.  Is this something that you can take

22    on, Alain?

23         MR. BOILEAU:  I believe so.

24         MAYOR TRANTALIS:  Okay.  Do I hear a second?

25         COMMISSIONER SÖRENSEN:  Second.
```



1          MAYOR TRANTALIS:  Well, you made the -- you

2     made the --

3          UNIDENTIFIED SPEAKER:  Rookie.

4          COMMISSIONER McKINZIE:  First of all, I

5     think -- first of all, before we make the decision

6     to move forward, I think we need to consider what

7     we're asking of whomever we decide to do this, what

8     time frame, you know, and put some other things in

9     place.  I think tonight we can probably get any one

10    of our attorneys to opine on this.  I think we've

11    gotten a legal opinion before.  I think it was to

12    allow the lease to expire.

13         MAYOR TRANTALIS:  Well, before we get there,

14    I just want -- I just want to make sure we --

15    because we're going to ask questions now of our

16    city attorney, and we need to have an interim city

17    attorney.

18         COMMISSIONER McKINZIE:  Just for -- I wanted

19    to do this just for tonight.

20         MAYOR TRANTALIS:  To appoint an interim

21    attorney?

22         COMMISSIONER McKINZIE:  Just for tonight and

23    we can decide --

24         MAYOR TRANTALIS:  Okay.  I understand.  All

25    right.  So does anyone have any objections to Alain

1    Boileau being the interim city attorney --

2        COMMISSIONER McKINZIE:  Just for tonight.

3        MAYOR TRANTALIS:  -- for tonight?

4        COMMISSIONER McKINZIE:  And we figure it out

5    later on.

6        MAYOR TRANTALIS:  Okay.  Alain, would you

7    mind coming up here?  Thank you.

8        Alain, do you have any background on the

9    license agreement?  Has this task been assigned to

10   you at any point in the past?

11       MR. BOILEAU:  No, Mayor.  I was not assigned

12   to this particular task.

13       MAYOR TRANTALIS:  Was Lynn Solomon involved

14   with this?

15       MR. BOILEAU:  I believe so.

16       MAYOR TRANTALIS:  Or Paul?  Paul, were you at

17   all involved with the interpretation of the license

18   agreement?

19       COMMISSIONER McKINZIE:  It's a yes-or-no

20   question.

21       UNIDENTIFIED SPEAKER:  I was.

22       COMMISSIONER McKINZIE:  All right.  So I

23   guess what we want to know tonight -- Mayor, if I

24   may?

25       MAYOR TRANTALIS:  Yeah, go ahead.

```
 1          COMMISSIONER McKINZIE:   -- is to give us

 2     clarification.  Do we have the authority to break

 3     our lease?  And if we break our lease, what are the

 4     ramifications of that, or should we just go the

 5     distance of the lease and make a decision at that

 6     time when it's time to renew the lease?

 7          UNIDENTIFIED SPEAKER:  This is on the license

 8     agreement for the War Memorial Gun Show?

 9          MAYOR TRANTALIS:  Yes.

10          COMMISSIONER McKINZIE:  That is correct.

11          MAYOR TRANTALIS:  He wanted to be -- he

12     wanted to clarify -- why don't you come up to the

13     podium.  That way you have a microphone.

14          Lynn, were you at all involved in this?

15          UNIDENTIFIED SPEAKER:  I'm sorry?

16          COMMISSIONER McKINZIE:  The license agreement

17     with War Memorial.

18          MAYOR TRANTALIS:  The license agreement with

19     the -- with the gun show at War Memorial, have you

20     ever been asked for an opinion on that?

21          MR. BOILEAU:  Mayor, I do know that in

22     looking at the gun issue, I had looked at the

23     agreement itself which terminates in November of

24     2018.  It can be terminated for good cause.  Of

25     course the question always comes as to what
```

1    constitutes good cause.

2         MAYOR TRANTALIS:  I believe the actual

3    language also says if it threatens public safety.

4         MR. BOILEAU:  Correct.  I mean, there's --

5    that would have to be somewhat of a direct, but

6    that again is up to interpretation.

7         MAYOR TRANTALIS:  Right.  And but at the same

8    time it expires of its own accord in November,

9    correct?

10        MR. BOILEAU:  Correct, November 2018.

11        MAYOR TRANTALIS:  Right.  So -- so according

12   to the interpretation of good cause, you know, if

13   we were to terminate it in advance of November,

14   that would be a litigious issue, would it not?

15        MR. BOILEAU:  Yes, it would.

16        MAYOR TRANTALIS:  So we could be sued based

17   on that.  At the same time I think we can -- we can

18   make the attempt to try to talk to the operator.  I

19   have done this once before.  I did meet with the

20   operator right after the Pulse nightclub killings,

21   and he was pretty adamant he wasn't ever going to

22   change his mind, and he was going to continue to

23   have the gun shows at War Memorial.

24        I do believe it was the opinion of the past

25   commission to continue the gun show and to continue

```
 1    the license as-is, but now that we have a new

 2    commission, I think we have a different philosophy.

 3    And -- and I think that -- I would like to think

 4    that we could perhaps come to some sort of

 5    consensus agreement tonight that moving forward, we

 6    would not want to continue the license agreement

 7    after the term is expired.  Do you have any

 8    comments?  Yes, Mr. Commissioner?

 9            COMMISSIONER GLASSMAN:  Mayor, I would like

10    to know how many shows are left before -- between

11    now and November?

12            MAYOR TRANTALIS:  I think six -- five or six.

13            COMMISSIONER GLASSMAN:  There are that many?

14            COMMISSIONER MORAITIS:  Oh, it's once a

15    quarter?

16            COMMISSIONER McKINZIE:  I thought it was,

17    like, two.

18            COMMISSIONER MORAITIS:  Yeah.  I thought it

19    was --

20            MAYOR TRANTALIS:  No.  There's one --

21            COMMISSIONER McKINZIE:  Do you know, Lee?

22            MAYOR TRANTALIS:  I don't have it in front of

23    me right now.

24            COMMISSIONER MORAITIS:  It's once a quarter.

25            UNIDENTIFIED SPEAKER:  I want to say there's
```

```
 1    four.  I'm just looking to Phil --

 2           MAYOR TRANTALIS:  Is that the number?

 3           UNIDENTIFIED SPEAKER:  -- to Phil to verify.

 4           COMMISSIONER MORAITIS:  That's a lot.

 5           COMMISSIONER McKINZIE:  Can we do this, since

 6    this is our manager, have him go back and bring us

 7    the necessary information?  We can have an

 8    intelligent discussion, which we all know what our

 9    hearts want and what we're trying to do to protect

10    our community and our kids based on the recent

11    activity in Coral Springs.  I think we all are

12    very, very concerned about a gun show being in our

13    park, and we just want to make sure that legally we

14    can do it, and we're doing the right things not to

15    cause any further repercussions to us financially,

16    legally, and those type things.  So we could do it

17    right.  I mean, I think we made a mistake on the

18    other one, but we had a vote and that's how things

19    turned out.  Let's get this one right.

20           COMMISSIONER GLASSMAN:  Good idea, and it

21    will be properly noticed.  The public will have a

22    chance to weigh in.  It will be transparent.  I

23    agree with that, and we'll have more facts.  And we

24    can certainly wait for two more weeks.

25           UNIDENTIFIED SPEAKER:  Okay.  And we'll have
```

```
 1    an -- we'll have an opportunity to study the

 2    agreement and bring back to you exactly what it

 3    says.

 4          COMMISSIONER McKINZIE:  And just remember,

 5    you have staff at your beck and call.  Anything you

 6    want an answer on, you don't have to get it

 7    tonight.  You can always go to them and get

 8    anything you want, all the facts to make these

 9    decisions, and I think it will just make us more

10    transparent and make us more cohesive in terms of

11    what we're trying to do.  I think we all think

12    alike.  We have the best interest of the city at

13    heart, but sometimes we don't always do it the

14    right way.

15          MAYOR TRANTALIS:  So as you're studying this,

16    Paul and Alain and whoever else in your department

17    participated in this analysis of the license

18    agreement, I guess the sense of the commission is

19    how -- what opportunity do we have to terminate

20    this license agreement so that we no longer have to

21    host this at War Memorial Auditorium.  Thank you.

22          (Excerpt ended.)

23

24

25
```

```
 1                   CERTIFICATE OF TRANSCRIPTION

 2

 3    STATE OF FLORIDA:
      COUNTY OF LAKE:

 4

 5         I, Kelly Roma, certify that I was authorized to and
      did transcribe the audio that was provided to me and that
 6    the foregoing Pages 3 through 11, inclusive, are a true
      and complete record of said audio to the best of my
 7    ability.

 8         I further certify that I am not a relative or
      employee of any of the parties, nor am I a relative or
 9    counsel connected with the parties' attorneys or counsel
      connected with the action, nor am I financially
10    interested in the outcome of the action.

11         DATED this 24th day of September, 2018.

12

13                        Kelly Roma
                        _____
14                        Kelly Roma
                          Court Reporter
15                        Notary Public State Of Florida

16

17

18

19

20

21

22

23

24

25
```

Fort Lauderdale Commission Meeting
AUDIO FILE, EXCERPT OF

Index: 20..nightclub

**2**

**20** 3:5

**2018** 3:5 7:24 8:10

**A**

**accord** 8:8

**action** 4:9

**activity** 10:11

**actual** 8:2

**adamant** 8:21

**advance** 8:13

**afternoon** 3:9,14,15

**agree** 10:23

**agreement** 3:18,25 6:9,18 7:8,16,18,23 9:5,6 11:2,18,20

**ahead** 4:4 6:25

**Alain** 4:17,20,22 5:25 6:6,8 11:16

**alike** 11:12

**analysis** 11:17

**appoint** 4:12,13 5:20

**as-is** 9:1

**assigned** 6:9,11

**attempt** 8:18

**attorney** 4:12,13 5:16,17,21 6:1

**attorneys** 5:10

**audio** 3:1

**Auditorium** 11:21

**authority** 7:2

**B**

**back** 10:6 11:2

**background** 6:8

**Bahia** 3:10,16

**based** 8:16 10:10

**beck** 11:5

**Boileau** 4:17,18,19, 23 6:1,11,15 7:21 8:4,10,15

**break** 7:2,3

**bring** 10:6 11:2

**business** 3:8

**C**

**call** 11:5

**chance** 10:22

**change** 8:22

**city** 3:4 4:12,13 5:16 6:1 11:12

**clarification** 7:2

**clarify** 7:12

**cohesive** 11:10

**comments** 9:8

**commission** 3:5,23 8:25 9:2 11:18

**Commissioner** 4:3, 4,6,15,16,19,25 5:4, 18,22 6:2,4,19,22 7:1,10,16 9:8,9,13, 14,16,18,21,24 10:4, 5,20 11:4

**community** 3:20 10:10

**concerned** 10:12

**consensus** 9:5

**constitutes** 8:1

**continue** 3:24 8:22, 25 9:6

**continues** 3:21

**Coral** 10:11

**correct** 7:10 8:4,9, 10

**couple** 3:8

**D**

**decide** 5:7,23

**decision** 5:5 7:5

**decisions** 11:9

**department** 11:16

**direct** 8:5

**discussion** 10:8

**distance** 7:5

**E**

**ended** 11:22

**excerpt** 3:4 11:22

**expire** 5:12

**expired** 9:7

**expires** 3:25 4:8 8:8

**expiring** 4:9

**F**

**facts** 10:23 11:8

**figure** 6:4

**file** 3:1

**financially** 10:15

**Florida** 3:2

**Fort** 3:4

**forward** 4:2 5:6 9:5

**frame** 5:8

**front** 9:22

**G**

**give** 7:1

**Glassman** 4:5,6 9:9, 13 10:20

**good** 7:24 8:1,12 10:20

**guess** 4:11 6:23 11:18

**gun** 3:10,16,19,21,25 7:8,19,22 8:23,25 10:12

**H**

**hear** 4:1,24

**heart** 11:13

**hearts** 10:9

**hopeful** 3:23

**host** 11:21

**I**

**idea** 10:20

**information** 10:7

**intelligent** 10:8

**interest** 11:12

**interim** 4:12,13 5:16,20 6:1

**interpretation** 6:17 8:6,12

**involved** 6:13,17 7:14

**issue** 7:22 8:14

**K**

**Kelly** 3:2

**kids** 10:10

**killings** 8:20

**L**

**language** 8:3

**Large** 3:3

**Lauderdale** 3:4

**lease** 5:12 7:3,5,6

**Lee** 9:21

**left** 9:10

**legal** 5:11

**legally** 10:13,16

**license** 3:18,25 4:8,9 6:9,17 7:7,16,18 9:1, 6 11:17,20

**litigious** 8:14

**longer** 11:20

**looked** 7:22

**lot** 10:4

**Lynn** 6:13 7:14

**M**

**made** 5:1,2 10:17

**make** 5:5,14 7:5 8:18 10:13 11:8,9,10

**manager** 10:6

**Mar** 3:10,16

**March** 3:5

**Mayor** 3:7,14 4:10, 18,20,24 5:1,13,20, 24 6:3,6,11,13,16,23, 25 7:9,11,18,21 8:2, 7,11,16 9:9,12,20,22 10:2 11:15

**Mckinzie** 5:4,18,22 6:2,4,19,22 7:1,10, 16 9:16,21 10:5 11:4

**meet** 8:19

**Meeting** 3:5

**Memorial** 3:22 7:8, 17,19 8:23 11:21

**mic** 3:13

**microphone** 7:13

**mind** 4:17 6:7 8:22

**mistake** 10:17

**MORAITIS** 9:14, 18,24 10:4

**move** 5:6

**moving** 4:2 9:5

**N**

**nightclub** 8:20



**Orange Legal**
**800-275-7991**

Fort Lauderdale Commission Meeting
AUDIO FILE, EXCERPT OF

**Notary** 3:2

noticed 10:21

November 4:8,9
7:23 8:8,10,13 9:11

number 10:2

**O**

objections 5:25

operator 8:18,20

opine 5:10

opinion 3:24 5:11
7:20 8:24

opportunity 3:18
11:1,19

**P**

park 10:13

participated 11:17

past 6:10 8:24

Paul 6:16 11:16

Phil 10:1,3

philosophy 9:2

place 5:9

podium 7:13

point 6:10

pretty 8:21

prior 4:9

PROCEEDINGS
3:6

properly 10:21

protect 10:9

public 3:2 8:3 10:21

Pulse 8:20

put 3:23 5:8

**Q**

quarter 9:15,24

question 4:11 6:20

7:25

questions 5:15

**R**

ramifications 7:4

read 3:17,18

recent 10:10

recommendations
4:14

record 3:24

regard 3:11

remember 11:4

renew 7:6

repercussions
10:15

Roma 3:2

Rookie 5:3

**S**

safety 8:3

sense 11:18

show 3:10,16,19,21,
25 7:8,19 8:25 10:12

shows 8:23 9:10

sir 3:13

situation 3:20

Solomon 6:13

Sorensen 4:3,15

SORENSON 4:16,
19

sort 9:4

speak 3:21

SPEAKER 3:12 5:3
6:21 7:7,15 9:25
10:3,25

Springs 10:11

staff 11:5

State 3:2

study 11:1

studying 11:15

sued 8:16

Sörensen 4:25

**T**

talk 3:8,12 8:18

talked 3:9,15

task 6:9,12

term 9:7

terminate 8:13
11:19

terminated 7:24

terminates 7:23

terms 11:10

things 3:8 5:8 10:14,
16,18

thought 9:16,18

threatens 8:3

time 5:8 7:6 8:8,17

tonight 4:20 5:9,19,
22 6:2,3,23 9:5 11:7

transcribed 3:1

transparent 10:22
11:10

TRANTALIS 3:7,
14 4:10,18,20,24
5:1,13,20,24 6:3,6,
13,16,25 7:9,11,18
8:2,7,11,16 9:12,20,
22 10:2 11:15

turned 10:19

type 10:16

**U**

understand 5:24

UNIDENTIFIED
3:12 5:3 6:21 7:7,15
9:25 10:3,25

**V**

verify 10:3

vote 10:18

**W**

wait 4:7 10:24

wanted 5:18 7:11,12

War 3:22 7:8,17,19
8:23 11:21

Wave 3:10,16

weeks 10:24

weigh 10:22

whomever 5:7

wondering 4:7

**Y**

yes-or-no 6:19

ORANGELEGAL

**Orange Legal**
**800-275-7991**

**EXHIBIT "3"**



**CITY OF**
**FORT LAUDERDALE**



August 31, 2018

Mr. Khaled Akkawi
Florida Gun Shows, Inc.
1349 S. Orange Blossom Trail
Apopka, FL  32703

**Re:    License Agreement, War Memorial Auditorium**
**Florida Gun Shows, Inc. ("Licensee")**

Dear Mr. Akkawi:

We are in receipt of your correspondence, dated August 14, 2018, requesting a 2019 License Agreement for Florida Gun Shows, Inc. at War Memorial Auditorium.  At this time, we will not be providing Florida Gun Shows, Inc. any proposed License Agreement for future shows beyond November 2018.  With regards to what we consider and interpret as your public records request, there are no responsive documents.

Sincerely,

Lee R. Feldman, ICMA-CM
City Manager

C:     Alain E. Boileau, Interim City Attorney
       Christopher J. Lagerbloom, Assistant City Manager
       Phil Thornburg, Parks & Recreation Director
       Carl Williams, Parks & Recreation Deputy Director
       Orlando J. Castellano, Auditorium Manager

**Office of the City Manager**
100 North Andrews Avenue, Fort Lauderdale, Florida 33301
Telephone (954) 828-5013, Fax (954) 828-5599
**www.fortlauderdale.gov**

Equal Opportunity Employer                                                    Printed On Recycled Paper.

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS** FLORIDA GUN SHOWS, INC.,
A Florida corporation, f/k/a SHOOT
STRAIGHT GUN SHOWS, INC.

**DEFENDANTS** CITY OF FORT LAUDERDALE ,
A Florida Municipality,

**(b)** County of Residence of First Listed Plaintiff   Orange County, Florida
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Woodbury, Santiago & Correoso, P.A.
9100 S. Dadeland Blvd., Suite 1702
Miami, Florida 33156 Telephone: (305) 670-9580

Attorneys *(If Known)*

**(d)** Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
  Plaintiff

☑ 3 Federal Question
  *(U.S. Government Not a Party)*

☐ 2 U.S. Government
  Defendant

☐ 4 Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*                   and One Box for Defendant

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☑ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed (See VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation Direct File  ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

*(See instructions):* a) Re-filed Case ☐YES ☑NO   b) Related Cases ☐YES ☐NO

JUDGE:                                             DOCKET NUMBER:

## VII. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
1st and 14th Amendment; VIOLATION OF FLORIDA STATUTE § 790.33

LENGTH OF TRIAL via one days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $   CHECK YES only if demanded in complaint:

JURY DEMAND:   ☐ Yes   ☑ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE   October 2, 2018   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          IFP          JUDGE          MAG JUDGE

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

| | |
|---|---|
| FLORIDA GUN SHOWS, INC.,<br>A Florida corporation, f/k/a SHOOT<br>STRAIGHT GUN SHOWS, INC.<br><br>―――――――――――――――――<br>*Plaintiff(s)*<br>v.<br>CITY OF FORT LAUDERDALE ,<br>A Florida Municipality,<br><br>―――――――――――――――――<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    City of Fort Lauderdale, FL
c/o MAYOR DEAN J. TRANTALIS
City Hall, 8th Floor
100 North Andrews Avenue
Fort Lauderdale, FL 33301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____         _____
                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

                                        _____
                                                    *Server's signature*

                                        _____
                                                    *Printed name and title*


                                        _____
                                                    *Server's address*

Additional information regarding attempted service, etc: