UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-62345-FAM

FLORIDA GUN SHOWS, INC.,
a Florida corporation, f/k/a SHOOT
STRAIGHT GUN SHOWS, INC.,

                Plaintiff,

vs.

CITY OF FORT LAUDERDALE,
a Florida municipality,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

      THIS CAUSE is before the Court on the Plaintiff's Motion for Preliminary Injunction (ECF No. 6), which was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation. The Motion is fully briefed and a hearing was conducted on January 8, 2019.  It now is ripe for consideration.

      The Plaintiff is an organizer and promoter of gun shows throughout the state of Florida, including a show which in past years has been held several times per year at the War Memorial Auditorium (WMA) in Fort Lauderdale.  The Defendant City of Fort Lauderdale (the City) has declined to honor a reservation for shows to take place at the WMA in 2019.  The Plaintiff seeks a preliminary injunction which: (1) restrains the City from violating its free speech rights and requires the City to issue license agreements to the Plaintiff for the promised future dates for the promotion of gun shows, under the same terms and conditions that the City offers to promoters of events other than gun shows; (2) declaring the City's actions violative of Fla.Stat. § 790.33 and

enjoining further violations of this statute; (3) awarding the Plaintiff its attorney's fees and costs incurred in this action, and (4) granting the Plaintiff any further relief the Court deems proper. Id. at 19.

## I. EVIDENCE PRESENTED

The Plaintiff called four witnesses in support of the Motion. Khaled Akkawi testified that he is the owner of the Plaintiff corporation, which he purchased in 2014. At that time, the corporation was named Suncoast Gun Shows, and had been promoting shows at the WMA for 30 years. The Plaintiff promotes 40 shows per year throughout the state of Florida. In 2015 and 2016, the Plaintiff presented 6 shows per year at the WMA, and in 2017 and 2018 there were 7 per year. Attendance generally is 3500 visitors per show.

Exhibitors at the Plaintiff's WMA shows come from the southeast United States, with most located within 100 miles of Fort Lauderdale. The Plaintiff sells tickets to the shows and rents tables to the exhibitors, who sell firearms, accessories, knives and gun-related items. The types of items sold at the shows can be purchased on the Internet. Occasionally there are political activities at the shows, and organizations such as the National Rifle Association can rent tables. The Plaintiff also offers at the shows the course that is required by the State of Florida before a concealed carry permit can be issued.

Mr. Akkawi identified Exhibit P1 as a photograph of a typical gun show. Families and children are welcome and encouraged, and children under 12 years of age are admitted free. Exhibit P2 depicts an advertisement for one of the Plaintiff's shows, reflecting that children are welcome if accompanied by an adult. Exhibit P3 is a photograph of a large roll-up sign advertising

gun safety classes.  Mr. Akkawi testified that the Plaintiff takes safety very seriously and noted that every gun purchaser at a show must go through a background check and waiting period. He explained that these requirements apply to sales by dealers, not to private sales, but pointed out that private sales are not permitted at the gun shows.  The prohibition against private sales is spelled out in Exhibit P4, a photograph of a sign displayed at all shows.

Mr. Akkawi stated that Exhibit P5 is a photograph of a sign reflecting that loaded firearms are not permitted at the Plaintiff's gun shows; this requirement applies to both dealers and attendees. Check-in procedures require that any gun brought into a show be unloaded and strapped so it cannot be fired. Exhibit P6 is a copy of an exhibitor agreement, with photos showing how guns must be tied.  Mr. Akkawi testified that the Plaintiff has a perfect safety record, with no incidents or arrests occurring at any of its shows.  There are 10 police officers at every show, some of whom are stationed outside the WMA, to ensure that all guns are in cases and that no illegal activities are taking place.

Mr. Akkawi related that at the time he purchased the Plaintiff corporation, it had existing license agreements with the City (Exhibits P7-P18). Each year Mr. Akkawi signed a license agreement for the following year, for the dates that had been reserved. This is the same system that is utilized for shows at other venues.  Initially, Orlando Castellano was the City's representative who reviewed the calendar with Mr. Akkawi. During the time that Mr. Akkawi has owned the Plaintiff, no promoter has ever challenged any of the Plaintiff's reserved dates. Additionally, the Plaintiff has complied with all of the agreements and Mr. Akkawi has never been advised of any breach. Exhibit P19 is a copy of an email from Mr. Castellano showing dates through 2025, and Exhibit P20 is a copy of Mr. Akkawi's own calendar reflecting those dates.

On cross examination, Mr. Akkawi acknowledged that the WMA is located within a park which includes recreation areas, and that his other gun show venues are not in parks. He stated that the Plaintiff earns income from the shows through gate fees, vendor fees and classes. Mr. Akkawi owns other companies which sell firearms and ammunition in stand-alone shops, including one called Shoot Straight, a vendor which sells at the Plaintiff's shows.

Mr. Akkawi testified that although the gun shows are family-friendly, the Plaintiff's advertising does not specifically reflect this and there are no play areas or activities for children at the shows. He identified several defense exhibits which depict items sold at the gun shows and/or at Shoot Straight: Exhibits D3-D13, D38 and D42. A photograph on the first page of Exhibit D38 shows an item which appears to be a grenade launcher, but actually is a novelty item. Other pages show AR15 semi-automatic rifles without clips; however, ammunition and clips are sold at the gun shows.

Mr. Akkawi conceded that the City had tried to assist him in finding a venue other than the WMA for his shows, and there is a show scheduled for September 2019 elsewhere in Broward County. Mr. Akkawi identified Exhibit D37, a letter from the Plaintiff's counsel seeking permission to employ fewer than 10 police officers at the gun shows. He also reviewed Exhibit D15, another letter from the Plaintiff's counsel, dated March 28, 2018, and indicating that the license agreements contained requirements not permitted by law, but with which the Plaintiff voluntarily had complied. Mr. Akkawi acknowledged that he had agreed to the terms in question.

Mr. Akkawi also admitted that each license agreement is for a one-year period. Dates are held in place for a longer period of time, but no deposit is required until the time an agreement is executed. Mr. Akkawi did not know precisely how many guns are sold at any given show.

However, Shoot Straight is the largest vendor (approximately 20% of each show's sales), and it sells approximately 200 guns per show.

Orlando Castellano testified that he has been the manager at the WMA since May 2011, and that the WMA has had a relationship with the Plaintiff and Suncoast Gun Shows for more than 30 years.  Mr. Castellano is familiar with how the gun shows are promoted via the license agreements, and stated that the Plaintiff and Suncoast have abided by the terms of their agreements.

Mr. Castellano stated that in the past there had been private gun sales and instances of open carrying, *i.e.*, carrying guns not secured inside a case, taking place in the parking lot of the WMA. Between 2012 and 2013, a requirement was initiated that 10 police officers be present for high profile events at the WMA. According to Mr. Castellano, the number of officers required is determined by the police department.  He identified Exhibit P21, a copy of an email indicating that no violent incidents had occurred at any of the Plaintiff's shows, and Exhibit P22, copies of police reports relating to the two non-violent incidents (a minor auto accident and a found wallet) which had occurred at the shows. Mr. Castellano testified that homeless people transit through the park, and a small number spend the nights there. He also testified that he is not aware of any drug problems. Also, beginning in 2016, there have been protests by a group of about 6 people at the Plaintiff's shows.

Mr. Castellano stated that in 2012, he authored the WMA Policies and Procedures, (Exhibit P24).   The initial section of this document describes its purpose:

> To provide a guideline and procedures for the rental of the War Memorial  Auditorium (WMA), a multipurpose rental facility that hosts a wide variety of events to enhance the lives and leisure time of the Citizens of Fort Lauderdale and surrounding communities.

> We strive to provide these experiences while operating the facility
> with no cost to the City taxpayers.  Revenue is achieved through
> facility rentals, equipment rental, parking fees, concession sales, and
> reimbursement for labor and services.

(Exhibit P24 at 1)

Regarding decisions to enter into a lease agreement, the document states:

> War Memorial Auditorium is a multi-purpose facility available to be
> rented for events, meetings and activities.  The Auditorium Manager
> reviews rental requests on a case-by-case basis in conjunction with
> the Parks and Recreation Deputy Director.  The WMA management
> reserves the right to decline rental under certain circumstances
> including, but not limited to, previous failure to abide by the terms of
> the contract; failure to pay required fees or costs; illegal or
> inappropriate activities or subject matters.

Id.

Mr. Castellano explained that the practice of holding dates for promoters is standard, and dates are held for 2 weeks without requiring a deposit. Mr. Castellano has the discretion to extend the 2-week period, and there is also a procedure for others to challenge the dates which are held. Mr. Castellano and Mr. Akkawi worked out reserve dates through 2025, as reflected in an email from Mr. Castellano (Exhibit P19) and the calendar (Exhibit P20).  These dates were released in October 2018 after the Plaintiff's license was not renewed.

Mr. Castellano testified that the WMA has entered into a license agreement to present mixed martial arts (MMA) events, which involve fights within metal enclosures with multiple safety requirements (Exhibit P27). Mr. Castellano has not received any communication from the Fort Lauderdale City Manager regarding whether MMA is family-friendly entertainment.

On cross examination, Mr. Castellano identified Exhibits D47-D48 as showing the types of activities which take place in Holiday Park, where the WMA began operations in 1950.  He

6

stated that he authored Exhibit P48, which is a brief description of the WMA as "an asset [which] continues to generate revenue for the city," and lists some of the events which take place there, including an international collector car auction, bodybuilding championships, PRIDE (serving the LGBT community), MMA events and the Orchid Show.

Mr. Castellano stated that prior to his employment at the WMA, he spent 24 years at the Dade County Auditorium, and he is familiar with the standard industry practice of holding dates for future events. He described this practice as a right of first refusal, and explained that no date can be locked in until there is a license agreement and payment of a deposit. Mr. Castellano has, on occasion, declined to issue licenses based on the content of the proposed events. Some events he has refused to license include "The Bodies" exhibit (which involved preserved corpses), an adult toy show and a topless circus.

Mr. Castellano identified Exhibit D25, a June 2016 email from his immediate supervisor, Carl Williams, Deputy Director of the Parks and Recreation Department. The email was a response to a report of complaints from parents about gun shows being held in Holiday Park at the same time as their youth sport programs. Mr. Williams' email states that guns are concealed before purchasers exit the WMA. Mr. Castellano testified that he has received no complaints about MMA, a professional sporting event in which an enclosure is utilized for the protection of both participants and spectators. The MMA events are held at night, while gun shows are held in the daytime on weekends.

Mr. Castellano stated that there had been no questions about the appropriateness of guns shows at the WMA until 2012, when the sale of guns increased. He added that currently there is a proposal to re-purpose the WMA as a venue for soccer and lacrosse, and another proposal to

change it to a concert venue. If either of these proposals is adopted, there will be no gate shows, the type of shows were admission is charged at the gate, of any kind held at the WMA.

Lee Feldman testified that he was employed by the City as City Manager until December 31, 2018. In this post, he was the chief executive officer of the municipal corporation, and made all decisions not specifically reserved to the City Commission. He identified Exhibit P29, his letter dated August 31, 2018, notifying Mr. Akkawi that the City was declining the Plaintiff's request for a license agreement for 2019, and would not be providing the Plaintiff any proposed license agreements for future shows beyond November 2018.

Mr. Feldman stated that he did not seek guidance from the Mayor or City Commission regarding the renewal of the Plaintiff's license agreement, but he was aware of comments on this subject that had been made by members of the Commission and others. He identified Exhibit P30, a partial transcript of a Commission meeting, but stated that he does not specifically recall any of the comments made in that excerpt. Mr. Feldman explained that the Commission meets twice per month, often for 12 hours at a time, and he does not recall any particular remarks made at any of the meetings. However, he conceded that in deciding not to renew the Plaintiff's license, he took into account the feelings expressed by the Commissioners, as well as other factors.

Mr. Feldman related that the license agreement is a City form which contains standard language except for paragraph 6, which includes material specifically pertaining to the license being issued. Mr. Feldman's practice was to forward any agreement executed by a licensee to the Parks Director or his delegate for his or her signature.

Mr. Feldman identified Exhibit P31, the City's answers to interrogatories propounded by the Plaintiff, and acknowledged that one of his reasons for not renewing the Plaintiff's license was

that gun shows are not "family-oriented entertainment," which is a subjective characterization.  Mr. Feldman's understanding of the phrase is that activities at the WMA should be consistent with those of a park, *i.e.*, events to which one could send an unaccompanied 13- or 15-year-old.  Although this is not a requirement for activities at the WMA, he viewed it as a philosophy or part of a business plan.  Mr. Feldman admitted, however, that licenses had been issued to the Plaintiff and its predecessor every year prior to 2018.

Mr. Feldman stated that until 2012, he did not even know that gun shows were being held at the WMA.  When he inquired why such events were being held in Holiday Park, the response was that it was a tradition.  Mr. Feldman decided to exert more control over the gun shows by requiring the presence of 10 police officers, based on consultation with the Chief of Police, as well as other restrictions.  In 2013 and 2014, some parents in the community expressed their concerns about the City's role in promoting an activity which was not in keeping with other activities in the park.

Mr. Feldman admitted that he knew of knew of no illegal sales at the Plaintiff's shows, but expressed his opinion that the emphasis at gun shows has changed in recent years from recreational gun use to self-defense.  He believes that the showcasing of militarized weapons was a factor in transforming gun shows into an activity which does not belong in a municipal park that is supported by taxpayers' dollars.  Mr. Feldman feels that a municipality which is buying guns back from people should not, at the same time, be engaged in putting guns back on the street.

Mr. Feldman testified that before deciding not to renew the Plaintiff's license agreement, he did not consider any analytical data concerning whether weapons sold at the Plaintiff's gun shows had been used in any crimes.  He does not know how many fewer guns or knives would

be sold as a result of eliminating the gun shows.  Nevertheless, he did not want the City to contribute to gun and knife violence and believed sales of weapons at least might be slowed by cancelling the shows.

Mr. Feldman stated that he did attend some of the Plaintiff's shows while employed as city manager, staying on each occasion for 10 or 15 minutes.  Mr. Feldman did not recall seeing any children at the shows he visited.  He conceded that he did not interview anyone prior to making the decision not to renew the Plaintiff's license.

Mr. Feldman also stated that he has done some research on MMA which revealed that it is a Florida-sanctioned sport which is no more violent than football or hockey.  He added that the MMA license agreement was not one submitted to him for decision, pointing out that he is not asked to decide on all licenses.  Mr. Feldman noted that one of his reasons for not renewing the Plaintiff's license was his belief that zoning regulations do not permit this use of the property, but acknowledged that this determination would rest with the zoning authorities.

In answer to a question posed by the undersigned, Mr. Feldman stated that his understanding of what activities are family-friendly has changed over time.  While his formulation is, to some degree, a general definition, it primarily applies to the Fort Lauderdale community, and has been influenced by community reaction to the recent mass shootings in Parkland and at the Fort Lauderdale airport.

On cross examination, Mr. Feldman testified that he holds two master's degrees and has been employed in local government for 33 years.  During this time, he has served as city manager of three different cities and was the president of the ICMA, an international organization of local government professionals.  He explained that the City is a municipal corporation which, after 1968,

10

derived its power from the home rule power set forth in the Florida constitution.  This power authorizes the City to do anything not expressly prohibited by law.

Mr. Feldman does not believe his action in failing to renew the Plaintiff's license agreement was pre-empted by the Florida gun control statute, which he interprets as applying to a municipality's passage of an ordinance, law or regulation, but not to actions by the City acting in its proprietary capacity.  He stated that his determination was a business decision which applied only to gun shows at the WMA in January 2019. Mr. Feldman pointed out that there is no prohibition of holding gun shows elsewhere in the city, noting that a recent gun show was held at the Fort Lauderdale Armory.

Mr. Feldman testified that his second reason for non-renewal had to do with the March 2018 letter from the Plaintiff's attorney (Exhibit D15) which referenced provisions in the license agreement which the Plaintiff believed to be illegal.  Mr. Feldman explained that the provisions in question involved security measures instituted after 2012, when guns were openly displayed and private sales were taking place in the WMA parking lot.  Even at that time Mr. Feldman did not believe it was appropriate to have gun shows in the park, but he decided to continue the Plaintiff's license agreements and add further safety protections.  He characterized this determination as another business decision, which he made to avoid the possibility of litigation.  However, the letter from the Plaintiff's counsel in March 2018 raised concerns that the Plaintiff might cease to comply with the added safety measures, which could result in a recurrence of the 2012 problems.

Mr. Feldman explained that after the shooting incidents at Parkland and the airport, the number of negative public comments about the gun shows increased.  Before that time, Mr. Feldman did not believe the City would support banning gun shows at WMA.  He added that in 2018,

the City bought back 100-200 guns from its citizens.

Finally, on redirect, Mr. Feldman admitted that he did not contact counsel for the Plaintiff for clarification of his letter, to ascertain whether the Plaintiff intended to comply with the provisions it believed to be unlawful.

## II. RECOMMENDATIONS OF LAW

### A. Requirements for Preliminary Injunction

A party seeking a preliminary injunction must show: (1) that it has a substantial likelihood of success on the merits of its claims; (2) that it will suffer irreparable injury unless the requested relief is granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party, and (4) that the injunction, if issued, would not be adverse to the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) (*per curiam*).[1]

The Plaintiff contends that it has a likelihood of success on the merits because the City's ban on gun shows at WMA: (1) violates the Plaintiff's First Amendment right to commercial speech, while not advancing any substantial interest of the City; (2) violates the Plaintiff's right to equal protection because the Plaintiff was treated differently from other similarly situated individuals; and (3) constitutes improper regulation of the sale of guns and ammunition, in violation of Fla. Stat.

---

[1] A movant seeking a mandatory injunction, *i.e.*, an injunction which goes beyond the status quo and forces a party to act, must meet a stricter test; such injunctions are only to be granted "in rare circumstances in which the facts and law are clearly in favor of the moving party."  K.G. ex rel Garrido v. Dudek, 839 F. Supp. 2d 1254, 1260 (S.D. Fla. 2011) (citations omitted). Plaintiff's request for a preliminary injunction arguably seeks a mandatory injunction and should be measured against that exacting standard; if the Court had done so, the Plaintiff's request would fail.

§ 790.33, which establishes an exclusive right in the state legislature to regulate such sales.  As to the second prong of the test, *i.e.*, that Plaintiff will be irreparably harmed, the Plaintiff asserts that irreparable harm is presumed where there is a violation of the First Amendment right to free speech. The Plaintiff further argues that granting the injunction will cause the City no harm and that the public interest is served by any measure which protects free speech.

The City responds that Plaintiff's position on likelihood of success on the merits rests on its claim that the City's decision not to license gun shows at WMA is pre-empted by Fla. Stat. § 790.33. According to the City, this statute does not apply because: (1) the City's action was not a municipal ordinance or an administrative regulation or rule adopted by a local government, as those terms are used in § 790.33(1); (2) that the statute does not apply to an action by a municipality in the exercise of its proprietary authority; and (3) the decision not to license a gun and knife show does not constitute the regulation of the sale of firearms and ammunition.  Moreover, the City argues that the Plaintiff's interpretation of the Florida statute would render it unconstitutional under the United States and Florida constitutions.  The City also contends that the Plaintiff's First Amendment and Equal Protection claims are meritless because the City's action was a permissible regulation of commercial speech, and that there was no violation of the Plaintiff's "class of one" equal protection rights. Finally, the City argues that the Plaintiff lacks standing to assert the First Amendment rights of its vendors and patrons.[2]

Regarding irreparable harm, the City maintains that the Plaintiff has made no showing that monetary damages or other legal remedies would not be sufficient.  As to the remaining elements,

---

[2] The undersigned assumes, for purposes of this Report and Recommendation, that the Plaintiff has standing as the entity which leases the WMA to generate income by gate fees, vendor fees and payments for gun safety classes.

the City contends that it and the public have an overriding interest in not being exposed to military-style weapons in its public facilities and communities at large.

The undersigned notes, at the outset, that the Plaintiff's sole argument regarding the second requirement for issuance of a preliminary injunction: that it will suffer irreparable injury if the preliminary injunction is not granted, applies only to its First Amendment claim. The Plaintiff correctly points out that the deprivation of free speech rights constitutes an irreparable injury as a matter of law. Elrod v. Burns, 427 U.S. 347, 373 (1976). (ECF No. 6 at 17) As to it other claims, however, since the Plaintiff's loss is economic, it has an adequate remedy at law in the form of damages, and the element of irreparable harm has not been established. Jysk Bed'N Linen v. Dutta-Roy, 810 F.3d 767, 780 (11th Cir. 2015) (economic losses alone do not just a preliminary injunction). Therefore, in determining whether the Plaintiff is entitled to the requested relief, the undersigned's analysis will be confined to the Plaintiff's claim that its First Amendment commercial speech rights have been violated.[3]

### B. Likelihood of Success on the Merits of Plaintiff's First Amendment Claim

The parties agree that the offer for sale of guns, knives and ammunition at the Plaintiff's gun shows is lawful commercial speech, entitled to First Amendment protection as long as that speech is not misleading. Nordyke v. Santa Clara County, 110 F.3d 707, 710-711 (9th Cir.

---

[3]Subsequent to the hearing on the instant Motion, the Plaintiff filed a Verified Amended Complaint which adds state law claims for breach of express and implied contract (ECF No. 50 at 11-14). Plaintiff has not sought to expand its request for preliminary injunctive relief to include such claims. However, even if Plaintiff had done so, the Plaintiff has an adequate remedy at law in the form of damages for these claims, and cannot establish the element of irreparable injury in the absence of a preliminary injunction as to these new claims.

1997) (discussing Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748 (1976), extending First Amendment protection to commercial speech).  The parties also agree that once it is determined that an offer of goods for sale is a lawful activity and not misleading, a state or local regulation which restricts that activity must directly advance a substantial government interest and must not be more extensive than is necessary to serve that interest.  Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 566 (1980).  In so holding, the Court noted that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."  Id. at 562.

The City emphasizes the distinction between a municipality acting in its proprietary, rather than its law-making role in connection with its argument on the issue of pre-emption, but neither party addresses this distinction as it relates to the Plaintiff's First Amendment claim.  Central Hudson dealt with a regulation enacted by the New York State Public Service Commission, and applies to actions by state and local governments in their law-making capacities.  In contrast, the Supreme Court has recognized the "long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when 'the governmental function operating . . . [is] not the power to regulate or license, as lawmaker, . . . but, rather, as proprietor, to manage [its] internal operation[s]. . . ."  United States v. Kokinda, 497 U.S. 720, 725 (1990) (quoting Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 896 (1961)).  When the Government operates in its proprietary capacity, its actions will be deemed valid, for First Amendment purposes, unless they are unreasonable, or are "arbitrary, capricious or invidious."  Id., at 725-26 (quoting Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974)).

In Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788 (1985),

15

involving a challenge to an Executive Order excluding legal defense and political advocacy organizations from the Combined Federal Campaign , the Court noted that deciding whether the speech in question is protected speech is only the starting point of a reviewing court's inquiry. This is so because "[e]ven protected speech is not equally permissible in all places and at all times," and [n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property." Id. at 799-800.  Because "the Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' the Supreme Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Id. at 800 (quoting Greer v. Spock, 424 U.S. 828, 836 (1976)).

This analysis was devised in Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983), where the Supreme Court drew a distinction between property traditionally utilized as a public forum for the free exchange of ideas and property used as a nonpublic forum.  The Court held that when the property in question is a public forum, speakers can be excluded only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. Id. at 45; Cornelius, 473 U.S. at 800.  However, access to a non-public forum can be restricted by the Government as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46.  In assessing reasonableness, the Court must take into account the purpose of the forum and all the surrounding circumstances. Cornelius, 473 U.S. at 809. Moreover, "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable

16

or only reasonable limitation."  Id. at 808 (emphasis in original).

        The Perry court divided public fora into two categories: the traditional public forum and the forum created by government designation.  "Traditional public fora are those places which 'by long tradition or by government fiat have been devoted to assembly and debate.'" Id. at 802 (quoting Perry, 460 U.S. at 45).  In addition to this first category, "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Corneluis, 473 U.S. at 802 (citing Perry, 460 U.S. at 45 and 46 n.7).  The Supreme Court has emphasized, "[n]ot every instrumentality used for communication, however, is a traditional public forum or a public forum by designation," since "'[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the Government.'"  Cornelius, 473 U.S. at 803 (quoting United States Postal Service v. Council of Greenburgh Civic Ass'n, 453 U.S. 114, 129-30 (1981)).

        In the instant case, the undersigned finds that the City was acting in its proprietary capacity when making its decision not to renew the Plaintiff's lease agreement for 2019. Mr. Feldman testified credibly that this was a business decision made by him as City Manager which was limited to the gun shows scheduled for the calendar year 2019. Although Mr. Feldman was aware, from his attendance at City Council meetings, that the City Council likely would support his decision, he made it based on his belief that gun shows were not the type of family-friendly activities which should be held in an auditorium located in a public park.  Additionally, the March 2018 letter from the Plaintiff's counsel (Exhibit D15) raised concerns that the Plaintiff might challenge the security provisions that were incorporated in its lease agreements following problems which arose in 2012. Mr. Feldman wished to avoid litigation over those provisions, not to mention a resurgence of

problems in the WMA parking lot that had characterized past gun shows.

The characterization of Mr. Lehman's decision as a proprietary decision, rather than a "new rule," as the Plaintiff labels it, is consistent with the fact that other types of shows have been denied licenses at the WMA based on inappropriate subject matter (as authorized by the WMA's Policies and Procedures), as well as by the fact that gun shows are permitted elsewhere in the City. Additionally, treating this decision as a rule or regulation and granting the injunctive relief sought by the Plaintiff (approval of the Plaintiff's gun shows for future reserved dates) would render the City powerless to use its property for other purposes, such as the proposed uses as a soccer and lacrosse stadium or a concert venue. The Constitution simply does not require this. See Greer v. Spock, 424 U.S. 828, 836 (1976); Adderley v. Florida, 385 U.S. 39, 48 (1966).

Therefore, the first question which must be addressed is whether the WMA is a public or non-public forum. The Eleventh Circuit summarized and applied the analysis discussed above in Uptown Pawn & Jewelry, Inc. v. City of Hollywood, 337 F.3d 1275 (11th Cir. 2003), noting at the outset:

> The Supreme Court has held that the government does not create a public forum by permitting limited discourse; instead, the government must intentionally open a nontraditional forum for public discourse. To ascertain whether the government intended to designate a place not traditionally open to assembly and debate as a public forum, the Court has examined factors such as the policy and practice of the government, the nature of the property, and its compatibility with expressive activity.

Id. at 1278 (citations omitted). Moreover, "the Court has stated that it is a 'long-settled principle' that when the government acts in its position as a proprietor to manage its internal operations, as opposed to using its power as a regulator or lawmaker, those governmental actions are subject to a lower level

18

of First Amendment scrutiny." Id. (citation omitted).

   In Uptown Pawn, the City of Hollywood contracted with a third party (initially the Hollywood Jaycees) to handle the selling of advertising space on city-owned bus benches.  During the period of their contract, the Jaycees were prohibited from selling advertisements for liquor, tobacco, X-rated movies or massage parlors.  After the expiration of the Jaycees' contact, the City solicited bids from other entities who would be authorized to sell advertising space except to advertisers of liquor, tobacco, X-rated movies, adult book stores, massage parlors, pawn shops, tattoo parlors or check cashing.  Uptown Pawn & Jewelry, a pawn shop, filed suit, contending that the new exclusion of pawn shop advertising violated its First Amendment right to free speech.

   The court found that the city bus benches were a non-public forum, reasoning that the prior exclusion of advertisements for liquor, tobacco, X-rated movies and massage parlors indicated an intent by the City to raise the most funds possible and not to create a public forum open to all advertisers.  Id. at 1279.  "If the City perceives that allowing certain kinds of advertising will discourage 'higher caliber' advertisers from buying bus bench ads and thereby reduce revenue, then allowing 'low caliber' advertising would be inconsistent with the City's intended use of the bus benches: to generate as much revenue as possible." Id.  The fact that the City previously had allowed pawn shops to advertise on bus benches did not change the Court's conclusion, since a city "'has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed.'" Id. (quoting Lehman, 418 U.S. at 303).

   The court held that the City of Hollywood's prohibition on advertising by pawn shops was reasonable, even though the City had not offered any evidence to support it, noting that "the Supreme Court has stated that 'common sense. . . . is sufficient in this Court to uphold a regulation

under reasonableness review.'" Id. at 1280 (quoting Kokinda, 497 U.S. at 734-35).  The Uptown court found that "common sense supports the idea that it is reasonable for the City to limit 'less desirable' businesses' access to bus bench advertising in hopes that the limitation will encourage 'more desirable' advertisers," and upheld the prohibition.  Id. at 1281.

The instant case is similar to Uptown, in that the City has in the past found such activities as an adult toy show and a topless circus to be unsuitable to the WMA.  Given that access to the venue is not open to all who apply for a lease, the undersigned finds that it is not a public forum. The question then becomes whether Mr. Feldman's decision not to renew the Plaintiff's license agreement for 2019 was reasonable.

Mr. Feldman cited as the primary reason for his decision a long-held view that gun shows, which are held during the daytime and on weekends, are not the type of family-friendly activity appropriate for an auditorium located in a public park with play areas for children.  He noted what he perceived to be a shift in gun shows' emphasis after 2012 from recreational gun use to self-defense, as well as the increasing prominence of militarized weapons at the shows.  Mr. Feldman had been receiving complaints from parents about gun shows in Holiday Park, especially after the recent mass shootings in nearby Parkland, Florida and at the Fort Lauderdale airport.  Mr. Feldman also considered the March 2018 letter from the Plaintiff's counsel (Exhibit D15), which questioned the legality of safety measures that had been instituted after 2012, as suggesting the possibility of litigation if the Plaintiff decided to challenge those measures.

The Defendant correctly points out that Mr. Feldman's determination that gun shows are not "family-friendly" is a subjective one.  However, common sense clearly supports the concept that activities in public parks which include play areas for children should be suitable for all ages.

Indeed, Mr. Castellano has in the past refused to lease the WMA for activities which he deemed to be inappropriate for the venue.

The undersigned finds that Mr. Feldman was entitled to consider the emotional impact of the recent mass shootings on the parents and children in this community when deciding, at least for 2019, that a gun show was not an appropriate activity to be held at the WMA within Holiday Park. Moreover, in light of the problems of open carrying and private gun sales which arose in 2012, Mr. Feldman's concern about the Plaintiff's letter questioning the legality of the safety measures imposed in response to those problems also was reasonable. Renewing a lease which might result in litigation or security problems would not have been a particularly sound business decision, and Mr. Feldman had no obligation to contact Plaintiff's counsel for clarification before making that decision.

The undersigned concludes that: (1) the City's decision not to renew the Plaintiff's lease agreement for 2019 was made in its proprietary, rather than its law-making capacity; (2) the restriction of the Plaintiff's commercial speech was in a non-public forum; and (3) the decision to exclude the Plaintiff's gun show was reasonable. Accordingly, the Plaintiff has failed to show a substantial likelihood of success on the merits of its First Amendment claim, the only claim as to which the Plaintiff can show irreparable harm. Therefore, no preliminary injunction should issue.

### III. <u>CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Preliminary Injunction (ECF No. 6) be DENIED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 19th day of February, 2019.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:
  Counsel of record

22